James BROWN, Plaintiff,

v.

UNITED STATES STEEL
CORPORATION,
Defendant.

No. 85 C 5459.

United States District Court,
N.D. Illinois, E.D.

June 10, 1988.

David L. Cwik, Mary Anne H. Capron, Pretzel & Stouffer, Chartered, Chicago, Ill., for plaintiff.

Billy M. Tennant, U.S. Steel Corp., Pittsburgh, Pa., for defendant.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

This employment discrimination case is before the Court for a decision on the merits following a bench trial. After hearing testimony, reviewing the trial transcripts and exhibits in their entirety, and examining the credible evidence of record, the Court enters judgment in favor of the defendant, United States Steel Corporation, and against the plaintiff, James Brown.

### I. FACTS

Plaintiff, James Brown ("Brown"), is a black male. From April, 1968 until July, 1983, Brown was employed by defendant, United States Steel Corporation ("USS"). During his years of employment at USS, Brown performed a variety of assignments at USS's South Works Plant in Chicago, Illinois. USS hired Brown as a laborer. After serving as a laborer for a short period of time, Brown received a series of temporary assignments as a stopper maker helper, a mold setter helper, and a hooker. Eventually, Brown landed a permanent position as a third helper. Seven or eight years later, USS promoted Brown to the position of second helper. For the duration of his employment at USS, Brown held the position of second helper in the No. 4 Electric Furnace Department at South Works.

The No. 4 Electric Furnace Department ("the department") employed approximately 20 foremen and approximately 160 hourly employees. The majority of the foremen were white. Of the 160 hourly employees, approximately 70% were black, 20% were Hispanic, and 10% were white. Prior to 1982, the department served as a back-up to the BOP Shop. Thomas Cuikaj held the position of superintendent of the department. Under Cuikaj's reign, the department lost money for USS. USS eventually attributed this loss to Cuikaj's laxity in enforcing USS's disciplinary and safety policies.

By mid–1982, the world steel market had changed dramatically. Competition from the foreign steel industry had increased. At the same time, demand for competitive materials, such as concrete and plastic, had also increased, undercutting the demand for steel. As the demand for steel decreased, its supply increased, causing prices to drop.

In order to remain competitive within this type of marketplace, USS was forced to reduce its costs. To accomplish this goal, USS essentially initiated a reduction in force. USS substantially curtailed its operations, shutting down the blast furnace and the BOP shop. As a result of this reduction in plant capacity, USS laid off 1,000 to 1,500 employees and demoted many of those who remained. The No. 4 Electric Furnace Department, which had previously operated as a back-up to the BOP Shop, became the sole supplier of hot metal at South Works.

Within the No. 4 Electric Furnace Department, USS conducted a major overhaul. In October, 1982, Carl Besich, the former superintendent of the BOP Shop, replaced Thomas Cuikaj as the superintendent of the No. 4 Electric Furnace Department. When Besich received his assignment to the No. 4 Electric Furnace Department, his superiors instructed him that USS's goal was to lower the price of ingot so that USS could remain competitive and South Works could

remain vital. Acting on those instructions, Besich spearheaded an effort to reduce costs and increase productivity within the department. He launched this effort by convening eight to twelve informal meetings with small groups of hourly workers and asking for their suggestions on how to operate the shop more efficiently.[1]

After receiving this input, Besich introduced several new programs designed to reduce costs and increase productivity. Besich initiated a scrap management program to get the lowest cost scrap loaded correctly and efficiently. He also instituted a crane maintenance program to reduce the incidence of malfunctions at inopportune times, thereby avoiding production delays. In addition, he devised a safety program to minimize the number of employee accidents. He also implemented an employee evaluation program requiring the foremen to rate each first helper on a scale of one to ten in each of eight to ten categories reflecting level of skill and performance. If these employees did not receive a satisfactory evaluation, then they were temporarily removed from their positions on a six-month probationary basis and demoted to the next lowest position.[2] Finally, Besich established a program to combat excessive absenteeism and tardiness.

To implement this final program, Besich instructed Robert Sennert, the clerk for No. 4 Electric Furnace Department, to examine the employee attendance cards and compile a list specifying the number of absences (excused or unexcused) and tardinesses for each employee over the preceding two years. After receiving this list from Sennert, Besich analyzed the list to determine which employees had been absent or tardy frequently. Using the names of these employees, Besich then compiled

his own list and met with as many foremen as he could to review the list. At the suggestion of some of the foremen, Besich deleted from the list the names of some employees for reasons unrelated to race.[3] In its final form, the list contained the names of ten employees, all of whom were black. Besich knew that some of the individuals whose names appeared on the list were black because he had worked with them previously; however, he did not know whether most of the individuals whose names appeared on the list were black. The list included Brown's name.

In March, 1983, Besich published this first "watch list" [4] (alternatively coined a "hit list") to the foremen in the No. 4 Electric Furnace Department. In addition to designating the ten individuals with absenteeism or tardiness problems, the list contained some "get tough" language. This language directed the foremen to treat the employees on the list differently from the other employees in the department. Specifically, if an employee on the list reported absent or tardy, then he was to be removed from the line-up until he reported to the foreman, accompanied by his union committeeman, with an explanation for his absence or tardiness and proof to substantiate his explanation. The parties would then meet to review the reason or explanation proffered, and the foreman holding the meeting would determine, in his discretion, whether the reason was acceptable and whether disciplinary action was appropriate.

The "watch list" served several purposes. First, it highlighted for all of the foremen, who worked varying shifts, those employees with records of excessive absenteeism or tardiness. Second, it conveyed to those employees a message that USS

---

1. During one of the meetings with a group of pit crane operators, all of whom were black, one of the workers suggested that the only way to improve efficiency would be to rid the shop of those employees who were dilatory and slack.

2. After this policy took effect, Besich demoted four individuals under the terms described. Of the four demoted, two were white, and two were black. Besich then promoted four individuals to replace the demoted employees. Of the

four promoted, three were black and one was white.

3. Most of those whose names Besich deleted were close to retirement, had serious medical problems justifying their poor attendance records, or a like excuse.

4. Besich also issued a second "watch list" in August, 1983, after Brown was discharged.

would no longer tolerate excessive absenteeism or tardiness. Finally, it enabled USS to increase productivity and to eliminate the costs attendant to excessive absenteeism or tardiness.[5]

The "watch list" yielded mixed, yet effective, results. Productivity increased; absenteeism and tardiness decreased. Some of the employees on the list improved their work habits and mended their ways. Others simply quit. Still others, such as Brown, were disciplined and ultimately discharged.

USS discharged Brown on July 26, 1983. Eight days before, on July 18, 1983, Brown reported to work tardy. Because his name appeared on the "watch list," Brown's fore-

man removed him from the line-up. When Brown thereafter appeared with his union committeeman, Brown simply stated that he had been tardy because he overslept. Based on Brown's record, Besich did not consider Brown's excuse to be acceptable, so Besich issued to Brown a five-day suspension subject to discharge.[6] During the ensuing five-day period, Besich reviewed Brown's overall disciplinary record for the preceding five years.[7]

Brown's record revealed that between February, 1979 and July, 1983, USS had disciplined Brown for twenty different infractions involving either violation of plant rules or unsatisfactory work. Specifically, Brown's record disclosed the following:

| Date | Nature of Infraction | Discipline Received |
|---|---|---|
| 02/02/79 | Leaving assigned work area without being properly relieved | Written caution |
| 02/13/79 | Failure to wear a seat belt in violation of published safety rules | Written caution |
| 07/26/79 | Insubordination—refusal to perform assigned duties | Suspension for balance of turn (6.3 hours) |
| 08/15/79 | Carelessness in performance of duties performed | Written caution |
| 09/06/79 | Negligence in performance of duties assigned | Three-day suspension |
| 10/19/79 | Leaving assigned work area without permission | Three-day suspension |
| 12/17/79 | Absence without permission | Four-day suspension |
| 03/12/80 | Absence without permission | Five-day suspension |
| 01/30/81 | Leaving assigned work area without permission | Five-day suspension subject to a further suspension of five days |
| 07/20/81 | Failure to wear a seat belt in violation of published safety rules | One-day suspension |
| 07/15/82 | Negligence in performance of duties assigned | Written caution |

**5.** In his testimony, Besich identified several of the adverse effects of absenteeism and tardiness, namely: the need to hold over an employee from the preceding shift; the requirement of paying the person held over one and a half times his or her salary for working overtime; the decreased productivity of, and increased risk of accident to, the employee working overtime as a result of fatigue from working his or her regular shift; and the damage to morale.

**6.** According to the terms of its disciplinary policy, USS meted out discipline in varying degrees. The punishments ranged in severity from a writ-

ten caution to a five-day suspension subject to discharge. Obviously, a five-day suspension subject to discharge was the most severe discipline issued. During the five-day suspension period, the foreman (or other appropriate person), would review the employee's record and determine whether he or she should receive additional discipline or should be discharged.

**7.** Under the terms of the collective bargaining agreement then in force, USS was only permitted to review an employee's disciplinary record for the five-year period preceding discharge.

| Date | Nature of Infraction | Discipline Received |
|---|---|---|
| 07/26/82 | Absence without permission | One-day suspension |
| 09/07/82 | Negligence in performance of duties assigned | Written caution |
| 09/24/82 | Absence without permission | Two-day suspension |
| 09/30/82 | Carelessness in performance of duties assigned | One-day suspension |
| 02/01/83 | Leaving assigned work area without permission | Three-day suspension |
| 03/07/83 | Absence without permission | Four-day suspension |
| 03/28/83 | Failure to wear protective clothing in violation of safety instructions | Suspension for balance of turn (7.7 hours) |
| 03/28/83 | Insubordination—refusal to be reinstructed after safety violation | Five-day suspension subject to discharge |
| 07/19/83 | Absence without permission | Five-day suspension subject to discharge |

The union contract entitled Brown to grieve each of these disciplinary infractions. Nevertheless, Brown elected not to do so. Nor did Brown ever suggest to his union committeeman that race played a role in the decision to discipline him on any of these occasions.

Aside from disclosing the occasions above which had resulted in discipline, Brown's record disclosed that in 1982 alone, Brown had reported off, absent, or tardy on at least fourteen occasions without receiving discipline. Specifically, USS excused Brown without discipline as follows:

| | |
|---|---|
| 01/17/82 | Reported off |
| 01/30/82 | Reported tardy (0.5 hour) |
| 02/28/82 | Reported tardy (0.7 hour) |
| 03/05/82 | Reported absent |
| 03/06/82 | Reported tardy (0.2 hour) |
| 03/09/82 | Reported off |
| 05/27/82 | Reported tardy (0.5 hour) |
| 06/15/82 | Reported tardy (0.2 hour) |
| 07/01/82 | Reported off |
| 07/02/82 | Reported off |
| 07/13/82 | Reported tardy (0.2 hour) |
| 07/19/82 | Reported tardy (0.4 hour) |
| 11/21/82 | Reported off |
| 11/22/82 | Reported off |

Finally, Brown's record indicated that on May 13, 1983, Brown had reported to work one hour late. At that time, Cuikaj, in his capacity as assistant superintendent, issued to Brown a "last chance warning." Under USS's "last chance policy," the foreman would meet with the employee and his or her union representative in order to serve notice upon them that the company would no longer tolerate the employee's behavior or accept his excuses. In effect, the company would admonish the employee that he had been given his "last chance." [8]

When Besich reviewed Brown's record in order to determine whether he should convert Brown's five-day suspension into a discharge, Brown was on "last chance" status. Based on his own review of Brown's overall disciplinary record and on the recommendation of William Sconza, Brown's immediate supervisor, Besich decided that USS should discharge Brown. Although Brown grieved his discharge, he never raised the issue of racial discrimination in the grievance proceedings. During the final stages of the grievance proceedings, Brown's grievance was withdrawn by a union representative. Since the date of his discharge, Brown has been unemployed.

## II. ANALYSIS

Based on these facts, Brown alleges violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and

---

8. Issuance of a "last chance warning" did not necessarily mean that subsequent commission of a similar offense would culminate in an automatic discharge. In many instances, employees received more than one "last chance warning". Essentially, USS used the "last chance warning" as a means of straightening out an employee who was floundering, rather than as a ploy to validate an eventual discharge.

Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981.[9] The same standards govern liability under both claims. *See Freidel v. City of Madison*, 832 F.2d 965, 971 (7th Cir.1987); *Yarbrough v. Tower Oldsmobile, Inc.*, 789 F.2d 508, 511 (7th Cir.1986). The ultimate factual inquiry is whether the defendant intentionally discriminated against the plaintiff. *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983). In this circuit, the inquiry focuses on whether the employer's discriminatory intent was a "but for" cause of the adverse action. *McQuillen v. Wisconsin Educ. Ass'n Council*, 830 F.2d 659, 664 (7th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1068, 99 L.Ed.2d 248 (1988).

The courts have traditionally pursued this line of inquiry using the three-step framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and refined in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See, e.g., Yarbrough*, 789 F.2d at 511; *LaMontagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1409 (7th Cir.1984). The *McDonnell Douglas–Burdine* framework sets forth the rules governing the burden of proof, the burdens of production, and the order of proof. According to that framework, the plaintiff must first establish a prima facie case by offering evidence adequate to raise an inference that he was discharged on the basis of his race. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093–94. If the plaintiff succeeds, then only the burden of production shifts to the employer to "articulate a legitimate, non-discriminatory reason" for the employee's discharge. *McDonnell Doug-*

*las*, 411 U.S. at 802–03, 93 S.Ct. at 1824–25; *Burdine*, 450 U.S. at 254–55, 101 S.Ct. at 1094. If the employer meets this burden of production, then the employee must demonstrate that the employer's articulated reason is a mere pretext. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825; *Burdine*, 450 U.S. at 255–56, 101 S.Ct. at 1094–95. Plaintiff retains the burden of proof throughout this process. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

In *Aikens*, the Supreme Court noted that once an employer responds to the plaintiff's proof by offering evidence of a legitimate, non-discriminatory reason, the prima facie case analysis espoused in *McDonnell Douglas–Burdine* no longer matters. *Aikens*, 460 U.S. at 715–16, 103 S.Ct. at 1481–82. Following *Aikens*, many courts have dispensed with the *McDonnell Douglas–Burdine* three-step analysis once the case has been tried and have proceeded directly to the question of whether the evidence supports a finding of intentional discrimination. *See, e.g., Pollard v. Rea Magnet Wire Co., Inc.*, 824 F.2d 557, 558 (7th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987); *Benzies v. Illinois Dept. of Mental Health*, 810 F.2d 146, 148 (7th Cir.1987); *Morgan v. South Bend Community School Corp.*, 797 F.2d 471, 480 (7th Cir.1986); *Tulloss v. Near North Montessori School, Inc.*, 776 F.2d 150, 155 (7th Cir.1985). Nevertheless, other courts have continued to analyze discrimination claims using the three-step framework of *McDonnell Douglas–Burdine*. *See, e.g., Friedel*, 832 F.2d at 972; *Yarbrough*, 789 F.2d at 511. Whichever approach is used, the courts agree that the analytical framework suggested in *McDonnell Douglas* and *Burdine* was "never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evi-

**9.** Whether Brown intended to abandon his Section 1981 claim and proceed to trial solely on his Title VII claim remains unclear. In the pretrial order, Brown indicated that he intended to proceed to trial under both Title VII and Section 1981. Yet, in his trial brief, (filed after the pretrial order, but before trial), Brown stated that he planned to proceed to trial solely under Title VII. Brown's post-trial brief is si-

lent on the issue, though it only addresses the Title VII claim. Resolution of the issue makes no difference to the outcome because the same standards govern liability under both claims. *See Reeder–Baker v. Lincoln Nat'l Corp.*, 834 F.2d 1373, 1376 (7th Cir.1987); *Yarbrough v. Tower Oldsmobile, Inc.*, 789 F.2d 508, 511 (7th Cir.1986).

dence in light of common experience as it bears on the critical question of discrimination." *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949–50, 57 L.Ed.2d 957 (1978); *see also Yowell v. United States Postal Service,* 810 F.2d 644, 647 (7th Cir.1987).

■ In this case, USS responded to Brown's proof of a prima facie case in two ways. First, at the conclusion of Brown's case, USS moved for a directed finding, arguing that Brown had failed to establish a prima facie case. Because the Court deferred ruling on USS's motion until we had the opportunity to review the evidence and resolve many of the inconsistencies, USS then proceeded to offer evidence of a legitimate, non-discriminatory reason for discharging Brown. In view of USS's alternative approach, we believe that the *McDonnell Douglas–Burdine* three-step analysis is the most efficient way to evaluate the merits of Brown's disparate treatment claim.[10]

### A. *Prima Facie Case*

■ In this case, Brown charges that USS treated white workers more favorably than black workers in citing employees for various work infractions. As a result of this disparate treatment, Brown claims that he accumulated a disciplinary record which USS unfairly used as the basis for his discharge. Before analyzing the evidence offered by Brown in support of this claim, we recite the elements necessary to establish a prima facie case. An employee who asserts a claim of discriminatory discharge may establish a prima facie case by showing that (1) he belongs to a racial minority; (2) he was doing his job well enough to meet his employer's legitimate expectations; (3) in spite of his performance, he

was discharged; and (4) the employer sought a replacement for him. *Yarbrough,* 789 F.2d at 511; *LaMontagne,* 750 F.2d at 1409 n. 2.

Prior to trial, the parties stipulated that Brown is black and that USS replaced Brown with another employee. Thus, the first and fourth elements have been satisfied by Brown and require no further discussion. The second and third elements, however, pose a bit of an obstacle for Brown. While Brown undeniably presented evidence related to his job performance and the events culminating in his discharge, this evidence was inconsistent and contradictory.

### *Brown's Job Performance*

■ Four of the six witnesses called by Brown testified regarding the second element of Brown's prima facie case, the adequacy of his job performance. Two of these witnesses testified favorably; the other two testified rather unfavorably. Favorable testimony was first elicited from Brown, who testified in his own behalf. During this testimony, Brown stated that on his fifteenth anniversary of service, he received a letter of commendation from USS. Yet, later testimony revealed that the Department of Employee Relations at USS routinely sent such a letter to all employees, regardless of the quality of their performance, on their fifteenth anniversary of service.[11] Brown also testified that he had trained ten to twelve other employees between 1973 or 1974 and 1978. This testimony, however, was irrelevant because USS discharged Brown based upon his record from 1979 to 1983. Finally, Brown claimed that during his entire tenure at USS, he had never been told that his

---

10. In the trial brief submitted by Brown prior to trial, Brown argued three different theories of liability: (1) that Brown was a victim of disparate treatment in violation of Title VII; (2) that although USS may have had "mixed motives" in discharging Brown, race was a discernible factor in the decision to discharge him, thus rendering him a victim of intentional discrimination under *Bibbs v. Block,* 778 F.2d 1318 (8th Cir.1985); and (3) that USS maintained a policy or practice of citing black workers for infractions discriminatorily. In Brown's post-trial

brief, however, he stated that he no longer wished to pursue the second theory (since the Seventh Circuit expressly rejected such a theory in *McQuillen,* 830 F.2d at 664) or the third theory. Consequently, the Court restricts its analysis to Brown's claim that he was a victim of disparate treatment.

11. In this boilerplate letter, USS commended the recipient only for his or her loyalty.

work was unsatisfactory. This testimony was flatly contradicted by the testimony of Brown's supervisors at USS and by his disciplinary record, which revealed numerous work infractions involving carelessness and negligence. Brown not only failed to grieve these infractions, but also openly admitted, on cross-examination, that he felt that USS discriminated against him only between 1981 and 1983, not prior to that period. Thus, Brown effectively conceded that those disciplines issued by USS between 1979 and 1981 were well-grounded.

The other witness who testified favorably for Brown on the issue of the adequacy of Brown's job performance was Payton Granderson. A co-worker who also served as the union grievance representative from 1979 to 1982, Granderson has worked as a crane operator at USS for approximately 22 years and still remains in USS's employ. Granderson testified in the abstract that he thought Brown was "a good worker" and was "better than a lot of other workers." Granderson predicated this opinion on his ability to observe, from his vantage point as an overhead crane operator, approximately 95% of the events which occurred on the floor, where Brown worked. On cross-examination, however, Granderson conceded that he did not work alongside of Brown, that he never had occasion to merely sit and observe Brown, and that he was usually occupied with and concentrating on his own tasks. This testimony was neither knowledgeable nor credible. Instead, it was fraught with speculation, unsupported by concrete facts, and motivated by bias.

In contrast, the unfavorable testimony elicited on this issue was precise, forthright, and very credible. Thomas Cuikaj testified first. As superintendent of the No. 4 Electric Furnace Department prior to 1982 and as assistant superintendent after Besich arrived, he generally supervised Brown for approximately ten years. Even Cuikaj, who was regarded by all as much less demanding than Besich, described Brown as a "subaverage" or "marginal" employee "at best." He testified that

Brown required careful attention and had problems following instructions.[12]

Cuikaj's unfavorable testimony on this issue was corroborated by William Sconza, a USS foreman. Sconza served as Brown's immediate supervisor during 1982 and 1983. When asked his opinion of Brown's work performance, Sconza stated that Brown was a very physical person who would perform his job, but who liked to do things his own way and resisted change. According to Sconza, whenever possible, Brown would cut corners on the job, a very dangerous and costly habit in the electric furnace business. In addition, Sconza testified that Brown sometimes failed to follow instructions or became confused when given more than a couple of instructions.

Cuikaj and Sconza supervised Brown and worked closely with him. As such, they were in the best position to evaluate his work performance. During their testimony, they described in detail Brown's specific habits and problems. They cited examples. Brown's disciplinary record corroborated their testimony. This testimony was largely uncontroverted. By contrast, the testimony of Brown and Granderson lacked specificity, consistency, and credibility. Brown's testimony was not only inherently biased, but was contradictory and incredible. Granderson's testimony contained two flaws. First, Granderson was biased as a result of his friendship with Brown and his affiliation as a union grievance representative. Second, Granderson lacked the competency to evaluate the quality of Brown's work. He neither supervised Brown, nor even performed the same job as Brown.

After weighing the testimony elicited on this issue, we conclude that the testimony of Cuikaj and Sconza was worthy of credence, whereas the testimony of Brown and Granderson was not. In our opinion, the credible evidence of record demonstrated that at the time of his discharge, Brown was not performing his work well enough to meet his employer's legitimate expecta-

12. As a specific example of this problem, on one occasion, Brown added the wrong alloys to a "heat." As a direct result, the heat did not meet specifications and had to be scrapped. This mistake cost USS approximately $20,000.00 to $30,000.00.

tions. Perhaps those expectations increased under Besich's reign, but we cannot say that USS's decision to tighten the reigns in the aftermath of a substantial reduction in force was unjustified.

### Brown's Discharge

The evidence Brown offered on the issue of his discharge closely tracked the evidence offered on the issue of his job performance. Again, the same four witnesses furnished testimony and that testimony followed the same pattern of alignment.[13] While Brown and Granderson testified that USS discharged Brown in spite of his performance, Cuikaj and Sconza testified that USS discharged Brown because of his performance. We briefly distill this testimony and analyze its substance.

Essentially, Brown and Granderson both testified that they believed USS would not have discharged Brown had he been white. To bolster this testimony, they selectively identified two white employees, Thomas Klawitter and James Renko, as beneficiaries of USS's disparate treatment. According to Brown and Granderson, these employees had work performance records comparable to Brown's, but USS nonetheless failed to discharge them. As we discuss in more detail in the portion of this opinion addressing the pretext issue, the overall records of Klawitter and Renko did not compare to Brown's record. Thus, while USS may have treated Klawitter and Renko more favorably than Brown, this disparate treatment was in no way attributable to race.

The remainder of the testimony provided by Brown and Granderson on the issue of discharge was decidedly adverse to Brown's claim. For example, when questioned about the twenty instances of discipline for which Brown was cited, Brown unequivocally admitted that he did not ascribe a discriminatory motive to USS in eight of these instances (those issued between 1979 and 1981). Furthermore, when questioned about the specific events surrounding each of the remaining instances, Brown either conveniently lacked recollection of the events in question or summarily stated that they were "racist write-ups." Even when afforded the opportunity to explain how he deemed these occasions of discipline to be racially motivated, he could not do so. Significantly, Brown failed to grieve any of these disciplines.

In his testimony, Granderson, the union grievance representative from 1979 to 1982, confirmed this latter fact. Like Brown, Granderson generally testified that USS treated blacks, including Brown, less favorably than whites. Yet, Granderson conceded that while acting as the union grievance representative, he never filed a grievance raising the issue of racial discrimination on Brown's behalf. This was not the only damaging testimony elicited from Granderson. Apparently unaware of Brown's record for absenteeism and tardiness, Granderson also stated that if he were told that a USS employee had reported off or tardy without discipline on twelve different occasions during 1982, he would guess that that employee was white. That employee was Brown.

Brown's overall record speaks for itself. During the last five years of his employment at USS, USS disciplined Brown on twenty different occasions for work infractions. These infractions were not, as Brown suggests, limited to reprimands for absenteeism or tardiness; they also included reprimands for insubordination, carelessness, negligence, and violations of safe-

---

**13.** In his post-trial brief, Brown claims that the testimony of Joseph Jarzabowski, another co-worker and a union grievance representative since 1982, also supports this element of his prima facie case. We disagree. Close scrutiny of Jarzabowski's testimony reveals that he lacked specific knowledge about Brown's work performance, as well as the events preceding his discharge. Jarzabowski specifically testified that he never observed Brown's work habits, that he never processed a grievance for Brown which alleged racial discrimination, and that Brown never suggested to Jarzabowski that race played a role in USS's decisions to discipline or discharge Brown. Although Jarzabowski testified to his belief that USS treated blacks differently from whites, we believe that this testimony was biased and that it was not borne out by the bulk of credible evidence. In any event, we address the substance of his testimony in more detail in our discussion of the pretext issue.

ty rules. Sconza testified that he recommended Brown's discharge based on this overall record. Cuikaj testified that although he did not directly participate in the decision to discharge Brown, Brown was a "marginal" employee who had an attendance problem. We credit the testimony of Cuikaj and Sconza on the issue of Brown's discharge for the same reasons we credited their testimony on the issue of Brown's work performance.[14]

In the final analysis, the credible evidence elicited by Brown did not establish that USS discharged him *in spite of* his performance. On the contrary, it revealed that USS discharged Brown *because of* his performance. Because Brown produced no credible evidence to persuade us to the contrary on either this or the other element of his prima facie case, he failed to meet his initial burden of raising a presumption of discrimination.

### B. *Defendant's Articulation of a Legitimate, Non–Discriminatory Reason*

■ Even if this Court were to assume that Brown presented sufficient, credible evidence to establish a prima facie case, then the burden of production would shift to USS to "articulate some legitimate, non-discriminatory reason" for Brown's discharge. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. This is not tantamount to requiring USS to prove the absence of a discriminatory motive. *See Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 25, 99 S.Ct. 295, 295, 58 L.Ed.2d 216 (1978). In order to rebut Brown's prima facie case, USS must merely present evidence of a lawful reason for Brown's discharge. This evidence must be legally sufficient to justify a judgment for USS. *See Burdine,* 450 U.S. at 255, 101 S.Ct. at 1094–95.

■ USS met its burden of production easily. USS produced credible evidence that it discharged Brown based on his overall record. His discharge occurred in the aftermath of a significant reduction in force. During this period, USS essentially sought to increase productivity and decrease costs. As part of this effort, USS aimed to rid itself of some of "the dead wood"—those employees who simply were not productive enough to justify the cost of retaining them. Brown fell into this category.

USS established these facts through the testimony of Cuikaj, Sconza, and Besich.[15] All of them testified to Brown's unenviable disciplinary record, which we have already discussed in considerable detail. In addition, all of them testified to the events which precipitated USS's reduction in force. This testimony was entirely credible and uncontroverted. In conjunction with each of the individual disciplinary slips issued to Brown, this testimony certainly revealed a legitimate, nondiscriminatory reason for discharging Brown.

### C. *Evidence of Pretext*

Once USS articulated a legitimate, nondiscriminatory reason for discharging Brown, any presumption of discrimination dropped from the case. *See Burdine,* 450 U.S. at 255 n. 10, 101 S.Ct. at 1094–95 n. 10. Brown then bore the burden of persuading this Court that USS's proffered explanation for discharging Brown was pretextual. *See id.* at 256, 101 S.Ct. at 1095. Pretext may be established either directly, by demonstrating that a discriminatory reason more likely motivated USS, or indirectly, by showing that USS's proffered explanation is unworthy of belief. *See id.* Ultimately, this Court must decide which explanation of USS's motivation we believe. *See Aikens,* 460 U.S. at 716, 103 S.Ct. at 1482.

---

**14.** The Court is mindful that if credible and uncontroverted, the plaintiff's testimony on these issues, standing alone, might be sufficient to raise the inference necessary to establish a prima facie case. *See, e.g., Yarbrough,* 789 F.2d at 512. In this case, however, Brown's testimony (as well as Granderson's testimony) on all disputed issues of fact simply was not credible.

**15.** Besich was the only witness called to testify by USS in presenting its own case. Consequently, when analyzing whether Brown established a prima facie case, the Court did not consider his testimony.

In this case, Brown attempted to establish pretext in several ways. First, Brown challenged the stated reason for his discharge. According to Brown, USS discharged him not because of his overall record, but only because of his record for absenteeism and tardiness (his "AWOL record").[16] Brown, however, obviously misinterpreted the circumstances underlying his discharge. While it is true that Brown's last infraction for tardiness culminated in his discharge, the credible evidence revealed that Brown's history of absenteeism and tardiness did not form the sole basis for his discharge. Both Sconza and Besich testified that they recommended Brown's dismissal after reviewing his *overall* record. That record disclosed infractions not only for absenteeism and tardiness, but also for insubordination, carelessness, negligence, and violations of safety rules.[17] Thus, Brown's assertion that his discharge was predicated solely on his AWOL record was not borne out by the evidence.

Nevertheless, using his AWOL record only, Brown next attempted to establish pretext by pointing to two other similarly situated white employees, Thomas Klawitter and James Renko, whom USS purportedly treated more favorably than Brown. The credible evidence of record, however, revealed that the records of Klawitter and Renko provide a faulty basis of comparison. First, as we have already noted, Brown's overall record, rather than his AWOL record alone, prompted USS to discharge Brown; therefore, for purposes of Brown's discharge, any similarity between Brown's AWOL record and the AWOL records of Klawitter and Renko is without

consequence. Second, the overall records of Klawitter and Renko bear no similarity to Brown's.[18] Indeed, the evidence showed that neither Klawitter nor Renko was "similarly situated" to Brown.

■ Unlike Brown, Klawitter was an excellent performer who made a substantial contribution to the overall performance of the shop. Although USS hired him as an hourly worker, he performed so capably that USS promoted him to the position of foreman. As a result of the reduction in force which occurred in mid–1982, however, USS was forced to demote many of the employees it retained. Faced with the alternatives of discharge or layoff, USS demoted Klawitter to an hourly job. Shortly thereafter, he developed a drinking problem and began to report absent. Before his demotion, Klawitter had no record of absenteeism; his record was unblemished. Eventually, Klawitter was discharged by USS, but successfully completed a rehabilitation program under Section 14F of the collective bargaining agreement between USS and the United Steelworkers of America. After overcoming his drinking problem, Klawitter was reinstated.

Likewise, Renko was an excellent performer. Racing against the clock, he often reported to work with minutes to spare and left the minute he ended his shift. Because of this practice, Renko earned a reputation as one of the "minute men." Occasionally, while en route to work, Renko would encounter unforeseen delays, causing him to report to work several minutes late. However, he never reported absent for entire shifts, as Brown did. Nor was Renko the only "minute man" in the shop. Whether by design or through oversight, Brown con-

---

16. Of course, Brown also testified that USS proffered *no* reason for his discharge.

17. We accord considerable weight to the evidence of Brown's overall disciplinary record for several reasons. First, the slips which USS used to memorialize an infraction and which Brown received on each occasion of discipline were issued by a variety of different foremen (rather than just one or two) over a five-year period. Second, the foremen prepared these disciplinary slips contemporaneously. Third, after these disciplinary slips were issued, Brown failed to grieve any of these infractions, though he was

entitled to do so. Finally, Brown acknowledged that the first eight disciplinary slips were issued legitimately.

18. The numbers alone constitute telling evidence of this lack of similarity. Brown's overall record boasts of twenty infractions, contrasted with Klawitter's eight infractions and Renko's seven infractions. Moreover, if one uses Brown's record on the date of his discharge as the basis for comparison, the difference becomes even more stark. At that time, Klawitter's record revealed only two infractions and Renko's record revealed only four infractions.

veniently omitted evidence that Lee Banks, a black crane operator, was also a "minute man." Like Renko, Banks was also an excellent performer. Although both of these employees have been counseled and disciplined for this practice, they both remain employed at USS because of their excellent work performance.

Contrary to Brown's urging, these two instances do not exemplify a policy of disparate treatment based on race. Instead, they reflect a policy of disparate treatment based on a favorable and dependable work performance record. This Brown sorely lacked, as his disciplinary record confirmed.

▮ Perhaps realizing this, Brown finally attempted to establish pretext by showing that his disciplinary record was a sham. Brown did this not by disputing the authenticity of his overall record, but, rather, by attacking the discretionary policy underlying the issuance of discipline in the first instance. Specifically, Brown maintained that the white foremen at USS scrutinized his behavior more closely and cited him for work infractions more frequently because he was black. According to Brown, through this artifice, he accumulated an inflated disciplinary record, which USS used to disguise its true reason for discharging him.

To bolster this theory, Brown primarily relied on the testimony of Joseph Jarzabowski. The union grievance representative since 1982, Jarzabowski offered some testimony in support of Brown's claim. For example, he testified to his belief that USS generally treated white employees more favorably than black employees. Like Brown and Granderson, Jarzabowski cited Klawitter and Renko as beneficiaries of this perceived disparate treatment because USS more frequently accepted their excuses. Jarzabowski also pointed to the fact that all of those whose names appeared on the "watch lists," save one, were black. Finally, he noted that the majority of disciplined and discharged employees were black.

Jarzabowski substantially qualified these remarks in his other testimony, however. In spite of his belief that USS treated whites more favorably, Jarzabowski stated that he did not feel that he received more favorable treatment because he was white. Indeed, he conceded that it was more likely that USS accorded more favorable treatment to good employees, regardless of race. USS more frequently accepted excuses from them and more leniently enforced disciplinary policies against them. Furthermore, he acknowledged USS's lenient treatment of a number of black employees [19] and admitted that while the majority of employees disciplined or discharged were black, so were the majority of the employees. Most significantly, Jarzabowski testified that as the union grievance representative, he *never* processed a grievance objecting to the "watch list" or to this perceived racial discrimination, nor was it ever suggested that he do so.

In our opinion, that portion of Jarzabowski's testimony which lent support to Brown's claim was biased, speculative, and inconsistent when compared with that portion of his testimony which negated the existence of a discriminatory policy. We tend to credit this latter testimony because the vast majority of the other credible evidence corroborated it. That evidence revealed that while USS treated good employees more favorably than bad employees, it applied this policy without regard to race.

Aside from Jarzabowski's testimony, Brown relied on the "watch list" as evidence of USS's discriminatory disciplinary policy. Brown emphasized that all of those whose names appeared on the first list and all but one of those whose names appeared on the second list were black. Given the disproportionate number of black employees at USS, however, their overrepresentation on the lists was neither peculiar nor unexpected. Beyond that, Brown presented no credible evidence that USS earmarked blacks for these lists or otherwise

**19.** Jarzabowski specifically confirmed that USS discharged and reinstated one of the black employees on the "hit list" four times. In addition, he identified at least two other black employees to whom USS gave three or four "last chance warnings".

employed discriminatory tactics in compiling the lists.

On the contrary, USS presented uncontroverted evidence that its employees followed neutral procedures in compiling the information related to absenteeism and tardiness. Robert Sennert, the clerk for the No. 4 Electric Furnace Department, testified that Besich instructed him to examine the attendance cards of all employees and to prepare a list specifying the number of absences and tardinesses for each. Using payroll numbers only, Sennert compiled this information and gave it to Besich.

Besich then testified that he analyzed Sennert's list to identify those employees with a history of chronic absenteeism and tardiness. Using the names of these employees, Besich prepared his own list. Besich then met with as many foremen as he could to review the list. At the suggestion of some of the foremen, Besich deleted from the list the names of some employees for reasons unrelated to race. In its final form, the list contained the names of ten employees, all of whom were black. Besich candidly admitted that he knew that some of these employees were black because he had worked with them before, though he knew none of the people on the list well. Brown's name appeared on the list.

As borne out by the testimony of Besich, Cuikaj, and Sconza, Brown's history of absenteeism and tardiness (both excused and unexcused) certainly rendered him eligible for the list. When Besich issued the first "watch list" in March, 1983, Brown's record, dating back to 1979, disclosed that USS had formally disciplined him for absence without permission on five occasions and that USS had excused him without discipline for absence or tardiness on at least fourteen occasions during 1982 alone. Moreover, this formal record did not even take into account those occasions on which Brown reported "a few minutes late." By Brown's own admission, he "always got a pass" when he reported a few minutes late.

Brown's attempt to downplay the significance of his disciplinary record and to portray himself as the victim of a discriminatory disciplinary policy must fail. After hearing the evidence, we remain unconvinced that USS maintained any such policy or practice. In fact, the credible evidence revealed that all of USS's employees, regardless of race, received their fair share of breaks and warnings before being disciplined or discharged. Brown was no exception. USS may have maintained a policy of rewarding and accommodating its good employees.[20] Such a policy, however, makes sense; it is neither illogical nor illegal. Brown produced no credible evidence to the contrary and, thus, failed to persuade the Court that USS's proferred reason for his discharge was pretextual.

### D. *The Ultimate Factual Determination*

As the trier of fact, this Court must ultimately determine whether a discriminatory intent motivated USS to discharge Brown and whether that intent was a "but for" cause of Brown's discharge. *See McQuillen,* 830 F.2d at 664. Essentially, we are faced with two altogether different versions of the same story. For the reasons articulated throughout this opinion, we have elected to credit USS's version of the events and have declined to credit Brown's version. Based upon our analysis of all of the evidence, race constituted neither a "but for" factor, nor any factor at all, in USS's decision to discharge Brown. In arriving at this conclusion, we are mindful that racial discrimination is rarely overt; more often than not, it is cleverly camouflaged. In this case, however, the record abounds with evidence that USS discharged Brown on the basis of his overall record, not on the basis of his race.

Based on the credible evidence of record, the Court makes the following Findings of Fact and Conclusions of Law:

---

**20.** Significantly, Besich testified that he did not expect a "good employee" never to report absent or tardy; rather, he expected that even with a "good employee" "something would crop up once in a while."

## FINDINGS OF FACT

1. Brown is a black male who resides in Chicago, Illinois.

2. USS is a Delaware corporation licensed to do business in Chicago, Illinois.

3. The events giving rise to this dispute occurred in Chicago, Illinois.

4. From April, 1968 until July, 1983, Brown was employed by USS at its South Works Plant in Chicago, Illinois. During his years of employment, Brown held a variety of positions. At the time of his discharge, Brown held the position of second helper in the No. 4 Electric Furnace Department ("the department").

5. The No. 4 Electric Furnace Department employed approximately 20 foremen and approximately 160 hourly employees. The majority of the foremen were white. Of the 160 hourly employees, approximately 70% were black, 20% were Hispanic, and 10% were white.

6. Prior to 1982, the department served as a back-up to the BOP Shop. Thomas Cuikaj held the position of superintendent of the department. Under Cuikaj's reign, the department lost money for USS. USS eventually attributed this loss to Cuikaj's laxity in enforcing USS's disciplinary and safety policies.

7. By mid–1982, the world steel market had changed dramatically. Competition from the foreign steel industry had increased. At the same time, demand for competitive materials, such as concrete and plastic, had also increased, undercutting the demand for steel. As the demand for steel decreased, its supply increased, causing prices to drop.

8. In order to remain competitive within this type of marketplace, USS was forced to reduce its costs. To accomplish this goal, USS essentially initiated a reduction in force. USS shut down the blast furnace and the BOP Shop, which had previously been the lifeblood of South Works. As a result of this reduction in plant capacity, USS laid off 1,000 to 1,500 employees and demoted many of those who remained. The No. 4 Electric Furnace Department, which had previously operated as a back-up to the BOP Shop, became the sole supplier of hot metal at South Works.

9. Within the No. 4 Electric Furnace Department, USS conducted a major overhaul. In October, 1982, Carl Besich, the former superintendent of the BOP Shop, replaced Cuikaj as the superintendent of the No. 4 Electric Furnace Department. Besich enforced USS's disciplinary and safety policies more strictly than Cuikaj. Under Besich's supervision, the department earned money for USS.

10. After consulting with various groups of employees and receiving their input on how to operate the department more efficiently, Besich implemented several new programs legitimately designed to reduce costs and increase productivity. None of these programs was devised or designed to treat black employees less favorably than white employees. Nor were the USS employees who implemented and enforced these programs motivated by racial considerations.

11. One of the programs established by Besich aimed to reduce excessive absenteeism and tardiness. To implement this program, Besich prepared and issued a "watch list." The list designated those employees who had a history of chronic absenteeism or tardiness. In its final form, the list contained the names of ten employees, all of whom were black. The list included Brown's name.

12. Despite the racial composition of the first and second "watch lists," they were not prepared with a discriminatory animus. Nor were they intended to be used as a ploy to discharge black employees.

13. When Besich published the first "watch list," it contained some "get tough" language. The language essentially directed the foremen to treat the employees on the list more strictly than other employees in the department if they reported absent or tardy.

14. The list yielded mixed, yet effective results. Productivity increased; absenteeism and tardiness decreased. Some of the employees on the list improved their work

habits and mended their ways. Others simply quit. Still others, such as Brown, were disciplined and ultimately discharged.

15. USS discharged Brown on July 26, 1983. Eight days before, on July 18, 1983, Brown reported to work tardy. Because his name appeared on the "watch list," Brown's foreman removed him from the line-up. When Brown thereafter appeared with his union committeeman, Brown simply stated that he had been tardy because he overslept. Based on Brown's record, Besich did not consider Brown's excuse to be acceptable, so he issued to Brown a five-day suspension subject to discharge.

16. During the ensuing five-day period, Besich reviewed Brown's overall disciplinary record for the preceding five years. That record revealed that between February, 1979 and July, 1983, USS had disciplined Brown for twenty different infractions involving either violation of plant rules or unsatisfactory work. These infractions included citations for insubordination, carelessness, negligence, violations of safety rules, and absence without permission.

17. The union contract entitled Brown to grieve each of these disciplinary infractions. Nevertheless, Brown elected not to do so. Nor did Brown ever suggest to his union committeeman that race played a role in the decision to discipline him on any of these occasions.

18. Brown's record also disclosed that in 1982 alone, Brown had reported off, absent, or tardy on at least 14 occasions without receiving discipline.

19. Brown's record further indicated that on May 13, 1983, Brown had reported to work one hour late. At that time, he received a "last chance warning."

20. When Besich reviewed Brown's record in order to determine whether he should convert Brown's five-day suspension into a discharge, Brown was on "last chance" status.

21. Based on his own review of Brown's overall disciplinary record and on the recommendation of Sconza, Brown's immediate supervisor, Besich decided that USS should discharge Brown. Neither Besich, in arriving at the decision to discharge Brown, nor Sconza, in recommending Brown's discharge, was in any way motivated by racial considerations.

22. USS discharged Brown on the basis of his overall record, not on the basis of his race. Although Brown's tardiness on July 18, 1983 culminated in his discharge, Brown's AWOL record did not form the sole basis for his discharge.

23. Brown's disciplinary record was legitimate; it was not the inflated product of a policy or practice by USS of citing its black workers for disciplinary infractions more frequently than its white workers. USS maintained no such discriminatory disciplinary policy or practice.

24. Thomas Klawitter and James Renko, both white employees, were not treated more favorably than Brown because they were white and he was black. The overall records of Klawitter and Renko bore no similarity to Brown's overall record. Consequently, neither Klawitter nor Renko was "similarly situated" to Brown.

25. At the time of Brown's discharge, he was not performing his job well enough to meet USS's legitimate expectations. Brown was a subaverage or marginal employee.

26. Although Brown grieved his discharge, he never raised the issue of racial discrimination in the grievance proceedings. During the final stages of the grievance proceedings, Brown's grievance was withdrawn by a union representative.

27. Since the date of his discharge, Brown has been unemployed.

28. This Court has had the unique opportunity to observe the demeanor of the witnesses while testifying to the events giving rise to this dispute and to weigh the credibility of those witnesses. Based on our observations, we make the following credibility determinations:

    a. Although Joseph Jarzabowski's demeanor while testifying appeared to be sincere, his testimony on all disputed issues of fact was significantly

biased, equivocal, and only partially credible;

b. Robert Sennert's testimony was very credible, concise, and uncontroverted;

c. Although Thomas Cuikaj's testimony on some issues was not particularly knowledgeable, his testimony on all disputed issues of fact regarding the inadequacy of Brown's job performance and the events precipitating USS's reduction in force was very knowledgeable, forthright, precise, detailed, clear, and credible;

d. James Brown's testimony on all disputed issues of fact was evasive, fragmentary, equivocal, contradictory, and not credible;

e. William Sconza's testimony on all disputed issues of fact was knowledgeable, forthright, precise, detailed, clear, and entirely credible;

f. Payton Granderson's testimony on all disputed issues of fact was vague, speculative, and biased. Overall, his testimony was neither knowledgeable nor credible;

g. Carl Besich's testimony on all disputed issues of fact was knowledgeable, forthright, precise, detailed, clear, and entirely credible;

h. On all disputed issues of fact, we specifically find that USS's version of the events was worthy of credence and that Brown's version of the events was unworthy of credence.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over this cause pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

2. Venue properly lies in this district pursuant to 28 U.S.C. § 1391(b) and (c).

3. The same standards govern liability under both Title VII and Section 1981. *Freidel v. City of Madison*, 832 F.2d 965, 971 (7th Cir.1987); *Yarbrough v. Tower Oldsmobile, Inc.*, 789 F.2d 508, 511 (7th Cir.1986).

4. In order to prevail on a claim for discriminatory discharge, an employee must ultimately establish that he was a victim of intentional discrimination, *United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983), and that his employer's discriminatory intent was a "but for" cause of his discharge. *McQuillen v. Wisconsin Educ. Ass'n Council*, 830 F.2d 659, 664 (7th Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 1068, 99 L.Ed.2d 248 (1988).

5. The courts have traditionally evaluated discriminatory discharge claims using the three-step framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and refined in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The *McDonnell Douglas–Burdine* framework sets forth the rules governing the burden of proof, the burdens of production, and the order of proof. According to that framework, the plaintiff must first establish a prima facie case by offering evidence adequate to raise an inference that he was discharged on the basis of his race. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093–94. If the plaintiff succeeds, then only the burden of production shifts to the employer to "articulate a legitimate, non-discriminatory reason" for the employee's discharge. *McDonnell Douglas*, 411 U.S. at 802–03, 93 S.Ct. at 1824–25; *Burdine*, 450 U.S. at 254–55, 101 S.Ct. at 1094. If the employer meets this burden of production, then the employee must demonstrate that the employer's articulated reason is a mere pretext. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825; *Burdine*, 450 U.S. at 255–56, 101 S.Ct. at 1094–95. Plaintiff retains the burden of proof throughout this process. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

6. An employee who asserts a claim of discriminatory discharge may establish a prima facie case by showing that (1) he belongs to a racial minority; (2) he was doing his job well enough to meet his employer's legitimate expectations; (3) in

spite of his performance, he was discharged; and (4) the employer sought a replacement for him. *Yarbrough,* 789 F.2d at 511.

7. Because Brown did not produce credible evidence that he was performing his job well enough to meet USS's legitimate expectations and that he was discharged in spite of adequate performance, Brown failed to establish a prima facie case of racial discrimination.

8. Assuming an employee successfully establishes a prima facie case of discrimination, then the employer must produce evidence of a lawful reason for the employee's discharge. *Burdine,* 450 U.S. at 255, 101 S.Ct. at 1094–95. The employer, however, is not required to prove the absence of a discriminatory motive. *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 25, 99 S.Ct. 295, 295, 58 L.Ed.2d 216 (1978). The employer must merely present evidence to justify a judgment in its favor. *Burdine,* 450 U.S. at 255, 101 S.Ct. at 1094–95.

9. Even if this Court were to assume that Brown had produced sufficient, credible evidence to establish a prima facie case, USS easily met its burden of producing evidence that it discharged Brown for a legitimate, non-discriminatory reason.

10. Once an employer has articulated a legitimate, non-discriminatory reason for discharging an employee, the employee then bears the burden of persuading the Court that the employer's proffered explanation for discharging the employee is pretextual. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. Pretext may be established either directly, by demonstrating that a discriminatory reason more likely motivated the employer, or indirectly, by showing that the employer's proffered explanation is unworthy of belief. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. Ultimately, the Court must decide which explanation of the employer's motivation it believes. *Aikens,* 460 U.S. at 716, 103 S.Ct. at 1482.

11. Brown failed to establish that USS's proffered reason for discharging him was pretextual.

12. Brown failed to carry his ultimate burden of persuading this Court that but for his race, he would not have been discharged by USS.

13. As a matter of law, this Court concludes that USS did not discriminate against Brown based on his race and, therefore, that USS violated neither the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* nor the provisions of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

## III. DECISION

For the reasons outlined in this opinion, the Court enters judgment in favor of the defendant, United States Steel Corporation, and against the plaintiff, James Brown.