Gordon E. McQUILLEN,
Plaintiff-Appellant,

v.

WISCONSIN EDUCATION ASSOCIA-
TION COUNCIL, Donald E. Krahn, and
Morris Andrews, Defendants-Appellees.

No. 86–1885.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 14, 1987.

Decided Sept. 14, 1987.

As Amended Oct. 16, 1987.

Robert J. Gingras, Fox, Fox, Schaefer & Gingras, S.C., Madison, Wis., for plaintiff-appellant.

Stephen G. Katz, Kelly, Huas & Katz, Madison, Wis., for defendants-appellees.

Before WOOD, COFFEY and MANION, Circuit Judges.

MANION, Circuit Judge.

Plaintiff-Appellant, Gordon McQuillen, appeals the district court's judgment against him after trial on his hiring discrimination claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2. We affirm.

I.

Defendant Wisconsin Education Association Council (WEAC) is a labor organization that represents public school district employees throughout Wisconsin. WEAC is affiliated with the National Education Association (NEA). Defendant Morris Andrews is WEAC's Executive Director. Defendant Donald Krahn is WEAC's Director of Legal Services.

Prior to 1974, WEAC exclusively retained outside counsel to handle its legal matters. Since that time, WEAC has hired staff attorneys with a view towards eliminating the need for outside counsel. Along with the staff attorneys, WEAC has also employed law clerks. These clerks have usually been students at the University of Wisconsin Law School. Some clerks, however, have been licensed attorneys. The staff attorneys at WEAC are represented by the United Staff Union ("the Union"). The law clerks, including the Attorneys-Clerks, are not represented by the Union.

Plaintiff, Gordon McQuillen, began working for WEAC as a student law clerk in November, 1978. In January of 1981, after graduating from law school, he was admitted to practice in Wisconsin. Thereafter he continued to work with WEAC with the title of Attorney-Clerk.

In the summer of 1982, WEAC's legal department consisted of four staff attorneys and several law clerks. Among these clerks were three licensed attorneys, McQuillen, Jeanine Larson and Carol Rubin. At the end of that summer, WEAC decided that it needed to hire a fifth staff attorney. Pursuant to the terms of the governing collective bargaining agreement between WEAC and the Union, a notice announcing the new staff attorney position was posted internally in October, 1982. WEAC did not solicit outside applicants until March 1, 1983. According to WEAC, the long delay resulted from its attempts to negotiate a lower pay scale for the fifth staff attorney position with the Union. Further adding to the delay was WEAC's involvement in NLRB hearings over a representation petition the Union had filed.

McQuillen and Jeanine Larson applied for the position soon after WEAC posted the position internally. Attorney-Clerk Carol Rubin also expressed interest in the position. Although viewed as an excellent candidate, she chose to withdraw from consideration before the hiring process was completed because she had an outstanding job offer from another employer. After soliciting outside applicants WEAC received approximately 64 more applications for the fifth staff attorney position.

Once he received all the applications, Donald Krahn, WEAC's Director of Legal Services, invited WEAC's incumbent staff attorneys to examine the applications to acquaint themselves with the applicants' credentials. By May 10, 1983, Krahn narrowed the pool to 12 applicants for further consideration. These twelve included McQuillen and Larson, as well as the person who eventually received the position, Melissa Cherney. Four of the twelve selected by Krahn soon withdrew from consideration. Krahn and some of the current

staff attorneys interviewed the remaining eight applicants. Harold Menendez, the applicant considered to have had the best interview, subsequently withdrew from consideration. Krahn ranked McQuillen as having the second best interview, followed by Cherney.

After the interview process, Krahn narrowed the final selection pool to McQuillen, Cherney, and a third applicant, a woman named Jackie Kinnaman. On June 10, 1983, Krahn forwarded a memorandum detailing McQuillen's, Cherney's and Kinnaman's relative qualifications to Morris Andrews, WEAC's Executive Director. Andrews and Krahn subsequently discussed the three candidates' qualifications. On June 23, 1983, Andrews told Krahn to offer the position to Cherney. Krahn then offered and Cherney accepted the position.

At the time the challenged position was being filled, WEAC had a policy it referred to as its "Affirmative Action" policy. This policy stated:

Affirmative Action

A. WEAC Staff.

1. Minority is defined as Black, Native American, Chicano, Asian-American, and Women.

2. A serious systematic search shall be made for minority persons to fill WEAC staff vacancies until such time as the ratio of minority persons on the staff is balanced.

In June of 1983, approximately one week before WEAC made its hiring decision, WEAC amended paragraph 2 of the policy to read:

2. A serious systematic search shall be made for minority persons to fill WEAC staff vacancies until such time as the ratio of minority persons on the staff reflects the proportion of minority personnel governed by WEAC.

Further on, the policy provided:

... WEAC managers shall:

B. Recruit, hire, and promote in all position classifications without regard to ... sex....

---

1. At trial, McQuillen also claimed that the defendants retaliated against him for filing a sex discrimination charge in violation of 42 U.S.C.

## II.

### *PROCEEDINGS IN DISTRICT COURT*

After Cherney received the staff attorney position, McQuillen cried foul. Contending that he had not received the position because of his sex, McQuillen brought suit under Title VII.[1]

At trial, McQuillen claimed that absent the defendants' preference to hire a woman, he would have received the position soon after WEAC posted the position internally. According to McQuillen, WEAC sought outside applicants for the position only as part of an effort to find a woman or minority for the staff counsel position. He further claimed that absent WEAC's preference to hire a woman, he would have been chosen over Cherney. He introduced considerable evidence to substantiate his claim.

McQuillen established at trial that he had done fine work for WEAC in the past and was well regarded by his peers. In fact, all four of the current staff attorneys recommended him for the position.

He also presented considerable direct evidence that WEAC officials wanted to hire a woman for the position. For example, he produced a letter that Krahn wrote in June of 1982 in response to a potential employer who inquired about McQuillen. In pertinent part the letter stated:

Gordon would very much like to be a WEAC Staff Counsel. Our affirmative action program would require us to search for a qualified woman, if we were to create a fifth attorney position. Thus, his chances for employment here are very limited. It would be a genuine loss for all of us if he had to leave Wisconsin in order to find a permanent position in teacher labor relations. He will make a very good employee.

Besides this letter, McQuillen presented evidence that Krahn had told McQuillen as well as several of the staff counsel that he

---

§ 2000e–3(a). The district court found against McQuillen on this issue and McQuillen does not challenge that finding on appeal.

was being pressured to fill the position with a woman or minority group applicant.

McQuillen also claimed that WEAC's "affirmative action" policy victimized him. He provided evidence that WEAC's parent organization, the NEA, exerted great pressure on WEAC to hire employees under a strict quota system. He also pointed out that Andrews had never made the hiring decision for a staff attorney position prior to selecting Cherney.

In response to McQuillen's evidence, WEAC claimed that it handled the hiring procedure in a nondiscriminatory fashion and chose Cherney for the position because she was the most qualified candidate. WEAC emphasized that it never had a policy to offer staff attorney positions to attorney-clerks before soliciting outside applicants. It noted that its October 19, 1982 posting was simply to comply with a collective bargaining agreement provision requiring posting and was certainly not intended to constitute the entire hiring process. WEAC also noted that, absent exceptional circumstances, it had always hired its attorneys from applicant pools in the same way it hired Cherney. A male applicant who received the fourth staff attorney position in 1982 was hired pursuant to the same general procedure.

WEAC further stressed that McQuillen's contention that external candidates were sought only to find a woman for the position did not make sense. Two of the three internal candidates were women. One of these candidates, Carol Rubin, was an excellent candidate who left WEAC because WEAC would not accelerate the hiring procedure to accommodate her. The other internal candidate, Jeanine Larson, was among the twelve finalists for the new position.

WEAC contended that the decision to hire Cherney was simply a case of choosing the most qualified candidate. Cherney had excellent academic credentials, graduating with honors from the University of Wisconsin Law School. Her professional experience was diverse and well suited to WEAC's needs. Prior to applying for the position, Cherney had worked as a lawyer

for three years with the National Labor Relations Board. She had also had clinical and clerkship experience with the Wisconsin Employment Relations Commission, the Wisconsin Department of Justice, and a law firm utilized by WEAC.

Although McQuillen had done good work with WEAC, his academic record was not as distinguished as Cherney's and his work experience had not been as diverse. Furthermore, in 1982 WEAC had rejected McQuillen for the fourth staff attorney position. After that rejection, Krahn had told McQuillen that if he wanted to become a staff attorney he should obtain employment elsewhere, such as at the NLRB, in order to round out his experience. With the exception of one attorney, all previous staff attorneys had experience with outside organizations such as the NLRB, the Wisconsin Department of Justice, or the Wisconsin Employment Relations Commission.

At trial, WEAC downplayed Krahn's letter which claimed that McQuillen's chances for promotion were not good because WEAC was required to "search for a qualified woman" to satisfy its affirmative action program. The defendants claimed that Krahn was simply trying to cast the most favorable light on his opinion that McQuillen could not survive in open competition for a staff attorney position.

WEAC also discounted the staff attorneys' recommendations, noting that when McQuillen applied for the position open in 1982, several of the same staff attorneys recommended against hiring him. At that time, many of these same staff attorneys had told Krahn that WEAC could get higher quality candidates by soliciting outside applicants. WEAC also pointed out that the staff counsel were personal friends, as well as professional colleagues, of McQuillen's.

Finally, WEAC claimed that its "affirmative action" plan sought only to ensure that women and minorities are included in the applicant pool. The "affirmative action" plan, WEAC argued, had nothing to do with the hiring decision.

At the conclusion of trial, the district court entered judgment in favor of the

defendants. The district court did find that sex was a factor in the employment decision since both Krahn and Andrews preferred to hire a female or minority employee. The court specifically noted that WEAC was under pressure from the NEA to adopt what Andrews considered to be unlawful employment practices. There was testimony at trial that one of the NEA's standards for affiliation was the adoption of affirmative action targets or quotas—apparently without regard to whether there was any justification to discriminate against males and other non-favored individuals. Although finding that sex did factor into the decision, the district court found that it was not a determining factor in Andrews' ultimate decision to hire Cherney.

According to the district court, the exaggerated participation of McQuillen's colleagues in the hiring process, coupled with the political pressure on WEAC to hire women, led to a seriously flawed hiring procedure. The court found that, nonetheless, Cherney was the most qualified candidate and that she received the position because she was the most qualified candidate, not because she was a woman.

After the court entered judgment against him, McQuillen moved for a new trial, or alternatively, to amend the judgment to declare that WEAC's "affirmative action" plan was a determining factor in the employment decision and that the plan was unlawful. The district court found no causal connection between the "affirmative action" plan and the hiring decision, and denied McQuillen's request for a new trial.

Given the district court's finding that Cherney received the job because of her superior qualifications, plaintiff essentially wanted the district court to completely reverse its previous factual findings. Despite denying the motion for a new trial on the ground that no causal connection existed between the "affirmative action" plan and the hiring decision, the district court went on to address the plan's legality.

As an initial matter, the district court found the so-called "affirmative action" program to be so confusing and ambiguous that no one, not even those who were responsible for administering the plan, was quite sure what it said. The district court also found the plan did not relate to an appropriate labor market and was not based upon the need to remedy past discrimination or a manifest imbalance in the work force. (WEAC's membership had approximately 58–62% female and minority members, while WEAC's staff was approximately 40% female and minority.) Nonetheless, the district court held that the plan was not impermissible because it only required WEAC to "search"[2] for qualified women and minorities but did not require them to be hired over more qualified individuals. The district court also stated that the plan probably served "no useful purpose other than to appease the NEA and to spawn litigation."

### III.

### *ISSUES ON APPEAL*

There are three issues on appeal: (1) whether the district court erred when it

2. In upholding the validity of the plan the district court did not clarify what it meant by the term "search." WEAC contended that to "search" meant only to avoid an "old boy" word-of-mouth application procedure by instituting a comprehensive solicitation procedure that would be sure to create the broadest possible applicant pool containing the most talent to choose from. In essence, WEAC was contending that its "affirmative action" plan was not really an "affirmative action" plan, because no preference is given to women or minorities. On the other hand, McQuillen contends with some force that within the context of the plan "to search" means that, until the "quota of women and minorities was filled", WEAC is required to

leave the position vacant and to keep looking for women and minorities for the position even though qualified white, male applicants are available. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) (prima facie case of discrimination established by showing that, after applicant's rejection, "the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.") As will be discussed herein, we need not delve into the validity of this highly ambiguous and confusing "affirmative action" plan as there was no causal connection between the plan and McQuillen's rejection for the staff counsel position.

applied a "but for" standard of causation to McQuillen's hiring discrimination claim; (2) whether the district court's finding that sex was not a determining factor in the hiring decision was clearly erroneous; and (3) whether the district court erroneously failed to declare that WEAC's "affirmative action" plan violates Title VII (and therefore award plaintiff's attorney's fees as a "prevailing party" on a substantial issue involved in the litigation).

## IV.

### ANALYSIS

A. *"But For" Standard of Causation.*

McQuillen's first ground of appeal is that the district court erroneously applied a "but for" standard of causation to his hiring discrimination claim. He claims that a plaintiff need only show that sex was a factor in an employment decision to establish a Title VII violation. We disagree.

■ It is well settled in this circuit that "the ultimate inquiry in a Title VII disparate treatment claim is whether a discriminatory intent was a 'but for' cause of the adverse action." *See Germane v. Heckler,* 804 F.2d 366, 368 (7th Cir.1986); *see also Maguire v. Marquette University,* 814 F.2d 1213, 1216 (7th Cir.1987); *Wheeler v. Snyder Buick, Inc.,* 794 F.2d 1228, 1233 n. 4 (7th Cir.1986); *McCluney v. Jos. Schlitz Brewing Co.,* 728 F.2d 924, 928 (7th Cir. 1984); *Sherkow v. Wisconsin,* 630 F.2d 498, 502 (7th Cir.1980); *Matthews v. Allis-Chalmers,* 769 F.2d 1215, 1217 (7th Cir. 1985) (ADEA). Under this "but for" standard of causation it is not enough for an employee to show that an employer harbored some discriminatory motivation. Rather, the employee must establish that the discriminatory motivation was a determining factor in the challenged employment decision in that the employee would have received the job absent the discriminatory motivation. *See, e.g., Wheeler,* 794 F.2d at 1233 n. 4; *Sherkow,* 630 F.2d at 502.

Without citing any of the controlling Seventh Circuit authority on this issue, McQuillen urges us to apply the standard of causation applied by the Eighth Circuit in *Bibbs v. Block,* 778 F.2d 1318 (8th Cir. 1985) (*en banc*). Under *Bibbs,* a plaintiff establishes Title VII liability merely by showing "that an unlawful motive played some part in the employment decision." *Id.* at 1323. At that point the employee is presumably entitled to the full range of remedies under Title VII, including reinstatement, back pay, declaratory relief and attorney's fees. However, an employer may limit the remedies available to the employee if it can establish that, notwithstanding the discriminatory motivation, the employee would not have received the position. If the employer prevails on the "but for" issue, the employee may not receive reinstatement and back pay, though he still may receive other remedies such as attorney's fees and declaratory relief. *Id.* at 1324. Thus, unlike the Seventh Circuit where the "but for" analysis goes to the issue of liability itself, under *Bibbs* the "but for" analysis is relevant only to the issue of remedies.

We decline to upset well settled Seventh Circuit precedent on this issue by applying *Bibbs.* The "but for" standard applied in this circuit is supported both by Title VII's language and Supreme Court authority. Title VII contains a clear causal requirement between discriminatory motivation and the challenged employment decision. In pertinent part, Title VII makes it "an unlawful employment practice for an employer—... to fail or refuse to hire ... any individual ... *because* of such individual's ... sex...." 42 U.S.C. § 2000e-2(a) (emphasis added). The "but for" standard of causation reflects the causal requirement contained in the statute. Here, the district court found that WEAC hired Cherney *because* she was the more qualified candidate, not *because* of her sex. Likewise, McQuillen was not hired *because* he was considered relatively less qualified, not *because* of his sex.

■ Furthermore, in *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), the Supreme Court made clear that the "but for" standard of causation is the ap-

propriate standard to be applied in Title VII actions. In that case, the Supreme Court rejected arguments that a plaintiff is required to show that race was the sole reason for the employment decision. Rather, the Court stated that "no more is required to be shown than that race was a *'but for'* cause." *Id.* at 282 n. 10, 96 S.Ct. at 2580 n. 10 (emphasis added); *accord Mt. Healthy v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (no First Amendment *liability* if employer establishes that same decision would have been reached absent consideration of First Amendment rights); *see also Haskins v. Department of the Army,* 808 F.2d 1192, 1197 (6th Cir.1987) (no Title VII *liability* if employer shows that same decision would have been reached absent any discrimination), *petition for cert. filed,* 55 U.S.L.W. 3714 (April 7, 1987).[3]

In short, the *Bibbs* standard that plaintiff urges us to adopt is inconsistent with Title VII's language, Supreme Court authority and this circuit's authority. Because the "but for" standard best addresses the issue posed by Title VII—McQuillen was rejected because of Cherney's superior qualifications, not because of his sex—we decline to adopt the *Bibbs* standard.[4]

### B. *Sufficiency of District Court's Finding*

McQuillen next claims that the district court's finding that Cherney would have received the position absent any discriminatory motivation was clearly erroneous. This contention is not supported by the record.

A district court's findings of fact, particularly credibility determinations, are entitled to great deference on appeal. Fed. R.Civ.P. 52; *Anderson v. City of Bessemer City,* 470 U.S. 564, 573–76, 105 S.Ct. 1504, 1511–13, 84 L.Ed.2d 518 (1985). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson,* 470 U.S. at 574, 105 S.Ct. at 1512.

By arguing that the district court's findings are clearly erroneous McQuillen simply wants us to replace the district court's evaluation of the evidence with his own partial evaluation. The record before us, however, amply supports the district court's determination that Cherney would have received the position absent any discriminatory motivation on the part of the defendants. Cherney was an honors graduate of the University of Wisconsin Law School with three years of experience at the National Labor Relations Board. She also had experience with the Wisconsin Employee Relations Commission, the Wisconsin Department of Justice and a law firm frequently utilized by WEAC. Moreover, the hiring procedures were generally the same procedures used to hire the fourth staff attorney, a male. While McQuillen was undoubtedly qualified for the position, he did not have Cherney's academic qualifications or her range of experience. McQuillen's entire argument rests upon the fact that staff attorneys recommended him for the position and that Krahn ranked him ahead of Cherney on the interview. These were only two out of many factors involved in the hiring process. Viewing all the evidence, the district court's finding that sex was not a "but for"

**3.** Some circuits have engrafted the First Amendment "mixed-motives" analysis contained in *Mt. Healthy v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) onto Title VII disparate treatment claims and shift the burden of *persuasion* on the "but for" causation issue to the employer once an employee establishes that a prohibited factor entered into the employment decision. *See Haskins,* 808 F.2d at 1198; *Perryman v. Johnson Products,* 698 F.2d 1138, 1142 (11th Cir.1983). This circuit has held that the burden of persuasion on the "but for" issue rests with the employee. *See Wheeler,* 794 F.2d at 1233 n. 4; *Sherkow,* 630 F.2d at 502. Although these cases disagree as to whether the burden of

persuasion should be shifted on the "but for" issue, there is agreement that no Title VII *liability* is established if the record shows that the same decision would have been reached absent the discriminatory motive. *See Haskins,* 808 F.2d at 1197–98.

**4.** McQuillen also contended that he should be awarded attorney's fees under 42 U.S.C. § 2000e–5(k) because he established a Title VII violation under the *Bibbs* standard. Since we have rejected the *Bibbs* standard, we also reject his claim to attorney's fees.

factor is well supported by the record and is not clearly erroneous.

### C. *Affirmative Action Policy*

McQuillen's final challenge is that the district court erroneously failed to declare WEAC's affirmative action plan unlawful under Title VII. Despite his failure to succeed on his hiring discrimination claim, McQuillen invites us to review the legality of the affirmative action plan with an eye towards awarding him the attorney's fees and costs incurred in "proving the illegality of the plan." We decline McQuillen's invitation.

In a disparate treatment case, the burden of persuasion on the issue of discrimination rests with the plaintiff at all times. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). This includes the burden of proving that an affirmative action program is illegal—if the employer asserts that its hiring decision was made pursuant to an affirmative action program. *Johnson v. Transportation Agency, Santa Clara County*, — U.S. —, —, 107 S.Ct. 1442, 1449, 94 L.Ed.2d 615 (1987); *see also Wygant v. Jackson Board of Education*, 476 U.S. 267, —, 106 S.Ct. 1842, 1848, 90 L.Ed.2d 260 (1986) ("[t]he ultimate burden remains with the employees to demonstrate the unconstitutionality of an affirmative-action program"). If, as in the present case, the employer claims that its hiring decision was based on the applicants' relative qualifications, not an affirmative action program, a plaintiff must first establish that the employer was acting pursuant to an affirmative action plan before the plan's validity is placed into issue. McQuillen did not satisfy this initial burden because he failed to establish that he was denied the position as the result of WEAC's "affirmative action" plan. The district court found that defendants hired Cherney because she was the most qualified person, not because her hiring was dictated by the "affirmative action" plan. Because McQuillen failed to establish a causal connection between the plan and his hiring claim—the only claim before us on

appeal—there is no need for us to address the validity of WEAC's "affirmative action" plan.

We recognize that McQuillen also attempted to use the plan's mere existence as evidence of discrimatory intent even absent any causal connection between the plan and the hiring decision at issue. *Compare Lanphear v. Prokop*, 703 F.2d 1311, 1315 (D.C.Cir.1983) (court uses fact that employer was in process of adopting an affirmative action program as evidence of discriminatory animus against majority) *with Christensen v. Equitable Life*, 767 F.2d 340, 343 (7th Cir.1985) (existence of *lawful* affirmative action plan may not be used as evidence of discriminatory motivation), *cert. denied*, 474 U.S. 1102, 106 S.Ct. 885, 88 L.Ed.2d 920 (1986). Absent any causal connection between the hiring decision and the plan, however, a favorable conclusion by the district court on this issue would give McQuillen nothing but cumulative evidence on the issue of intent. It would not entitle him to attorney's fees. Simply having a favorable statement of law in an order that denies all relief does not entitle a plaintiff to attorney's fees as a prevailing party. *Hewitt v. Helms*, — U.S. —, —, 107 S.Ct. 2672, 2676–77, 96 L.Ed.2d 654 (1987). Accordingly, we express no opinion on the validity of the plan except to note our agreement with the district court that, if left intact, it is certain to spawn much divisiveness and litigation in the future.

### V.

### CONCLUSION

For the reasons stated above, the judgment of the district court is

AFFIRMED.