Charles WHALEN, Plaintiff–Appellant,

v.

Robert RUBIN, Secretary of the Treasury, Defendant– Appellee.

No. 95–2893.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 9, 1996.

Decided Aug. 7, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied Oct. 1, 1996.

Charles T. Whalen (argued), Chicago, IL, Pro Se.

Brian R. Havey, Office of the United States Attorney, Civil Division, Appellate Section, Chicago, IL, Marleigh D. Dover, Sean A. Lev (argued), Department of Justice, Civil Division, Appellate Section, Washington, DC, Thomas P. Wallsh, Office of the United States Attorney, Civil Division, Chicago, IL, for Defendant–Appellee.

Before POSNER, Chief Judge, and DIANE P. WOOD and EVANS, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Charles Whalen is an appeals officer at the Chicago office of the Internal Revenue Service. When he was passed over for a management position as associate chief of appeals, Whalen complained, believing that the reason for his lack of success was the IRS's affirmative action program. He exhausted his administrative remedies, sued in the district court, and lost there after a week-long trial to a jury. On appeal, his principal attack is on certain limitations the district court placed on his use of evidence relating to the IRS's affirmative action program. He also attacks the program directly and argues that the district court should have granted declaratory and injunctive relief in his favor. Because Whalen failed properly to preserve any arguments he might have had relating to injunctive relief or a pattern or practice discrimination claim, and because the district court handled his individual discrimination case appropriately, we affirm.

## I

Whalen (a white male) is both a licensed attorney and a CPA, with advanced degrees in business administration and taxation, who has been employed by the IRS since April 6, 1980. He has held his present position as an appeals officer (at the GS–13 level) in the IRS's Chicago Appeals Office since February 15, 1987. Initially, he handled a series of tax shelter disputes. At some point after 1987, he began attending law school at night. During that period of time, he asked his supervisors not to assign him to large or complex cases, even though these were generally desirable for the development of career skills—presumably he was satisfied that he was developing career skills in another, equally valid, way. From August 1990 to August 1991, the IRS gave him an unpaid leave of absence to finish law school.

Upon his return to the IRS after he earned his law degree, Whalen began to receive assignments to more demanding cases, including cases that would ordinarily be handled by more senior (GS–14) appeals officers. Thus, when the Chicago office posted a vacancy notice for a GS–14 appeals officer on December 17, 1991, Whalen applied for that position. Although Whalen did not get the job, no one else did either: on February 19, 1992, the IRS withdrew the vacancy notice for budgetary reasons. Shortly before that withdrawal, however, Whalen complained to the agency's Equal Employment Office (EEO) Counselor that he believed that his performance appraisal had been tainted by discrimination and was, as a result, unfairly low.

Whalen tried again for a promotion on April 21, 1992, this time applying for a position as a chief of appeals officer. (At about the same time he applied for this position, he told his immediate supervisor that "he was going to be applying for every Grade 14 position that was announced." The record, however, contains evidence about only the two applications described here.) In order to evaluate the applicants, the IRS created a "ranking panel" of three IRS officials. After reviewing the seven applications for the position that had been submitted (in addition to Whalen, four white men, one African–American woman, and one white woman), the panel graded Wanda Price (a white woman) as the most qualified candidate. Whalen tied with another candidate (another white man) for

last on the list; three other white men ranked ahead of him.

The ranking panel referred all seven candidates to a three-person interviewing panel, which included the selecting official, John Vest, chief of the Chicago appeals office. After completing the interviews, each member of the panel independently decided that Price was the best person for the job. They testified that they did not consider her gender in coming to that decision, nor did they rely on the IRS regional office's affirmative action program. Price had completed a pre-management training course and had substantial experience as an acting supervisor. In addition, Price had impressed the panel very favorably in the interview. Whalen, in contrast, lacked many of these qualities. Although he had the technical skills for the job, he had not taken the pre-management training course (which had occurred while he was on leave), had little experience as an acting supervisor, and had not previously indicated interest in a management career. Whalen also acknowledges that he made statements that were "disrespectful" to two of the panel members during his interview.

Whalen believed that the reason for his lack of success lay in the IRS's affirmative action policies. From 1988 through 1993, the IRS had two different systems that linked the monetary compensation of its managers and executives to their implementation of equal employment and affirmative action policies: the Performance Management and Recognition System and the Senior Executive's Performance Appraisal and Performance Award System. Under both systems, the quality of the manager's work on equal employment opportunity objectives was an element in their performance review. Bonuses and monetary compensation were potentially tied to these reviews.

Furthermore, both the nationwide Strategic Business Plan of the IRS (adopted in 1991) and the annual business plans stressed the need to create an "IRS culture free of barriers which limit equal opportunity for minorities and women," to "increase representation of minorities and women in managerial and executive positions," and to "remedy the present imbalances of minorities and

women in managerial and executive ranks." The Chicago office implemented these national plans with an affirmative action plan for Midwest Appeals that became effective in February 1992. Whalen alleged that there had been an *ad hoc* plan in place prior to that date, but whether or not that is true has no bearing on the appeal, for reasons we explain below. He also pointed to substantial evidence indicating that managers were praised for their successes in hiring and developing minority, women, and handicapped employees.

## II

The history of Whalen's case in the district court is important both for understanding the posture of the case before us and for appreciating which claims are still in the case at this point. Whalen's amended complaint (which appears only in the Government's supplemental appendix) contained six counts. Count I charged race discrimination against Whalen as an individual; Count II alleged that the IRS had engaged in a pattern or practice of race discrimination (but requested only relief for Whalen as an individual); Count III claimed sex discrimination; Count IV claimed a pattern or practice of sex discrimination (again seeking only individual relief); Count V charged that the withdrawal of the December 1991 job opportunity was done in retaliation for Whalen's complaint to the EEO counselor; and Count VI claimed age discrimination (on which the district court granted partial summary judgment for the IRS without objection from Whalen). Nowhere did Whalen suggest that he was bringing the case as a class action, and, consistently with that fact, he never sought class certification.

Often discrimination cases reach this Court after a district court has granted summary judgment for an employer, and we must consider questions like whether the plaintiff has adequately set forth a prima facie case, whether the employer has articulated a legitimate, nondiscriminatory reason for its action, and whether the plaintiff has shown enough evidence of pretext to withstand summary judgment. This is not such a case. Here, Whalen's case went to trial before a

jury, and the jury as fact finder resolved those difficult questions of purpose and causation against him. Undoubtedly recognizing the narrow limits on our ability to second-guess a jury's verdict, Whalen's appeal focuses on several crucial evidentiary rulings that the district court made prior to the trial, in a series of motions in limine.

First, the district court rejected both sides' extreme positions about the IRS's affirmative action plan. Its ruling was based on the limited relevance of the IRS's affirmative action policy to Whalen's claims. Although the IRS did not deny that it had some kind of affirmative action policy, it claimed that the policy played no role at all in its decision not to promote Whalen. It argued instead that Whalen had opportunities to obtain developmental work, that the IRS did not retaliate against Whalen for filing an EEOC complaint, and that the woman (Price) who was selected for the associate chief of appeals position was the best qualified candidate for the job. Accordingly, Judge Castillo rejected Whalen's effort to introduce extensive evidence about the plan, commenting that he didn't "consider this to be a case about whether or not affirmative action is defensible." On the other hand, Judge Castillo also denied the government's motion to keep evidence of the plan out altogether, ruling that Whalen could introduce some evidence about the plan to show that the decision makers had a discriminatory motive or intent. In keeping with this general position, the district court also refused on Rule 403 grounds to admit evidence about the IRS's alleged failure to discipline a female employee in the Chicago office, noting that it was "relatively weak in terms of relevance," and "might in some way confuse or mislead the jury," and it granted the government's motion to exclude testimony about IRS promotions for which Whalen did not apply.

At the week-long trial, more or less in keeping with these rulings, Whalen was able to bring out testimony about the existence and nature of the affirmative action plan in the Chicago IRS office. He questioned a number of IRS witnesses about the performance evaluation criteria to which they were subject and about the fact that they could receive bonuses based on their "success" in equal employment efforts. This evidence might have induced the jury to believe that Whalen's appraisals were unfairly low due to his race or sex, but it did not. Instead, believing the testimony of the IRS witnesses, the jury concluded that Whalen failed to prove his case. The district court, consistent with Whalen's proposed jury instructions and the agreed upon jury verdict form, submitted three questions to the jury: whether "Plaintiff, Charles Whalen, proved that his sex was more likely than not a motivating factor in Defendant's decision not to promote the Plaintiff to the associate chief position;" whether "Plaintiff, Charles Whalen, proved that he did not receive developmental assignments prior to February, 1992;" and whether "Plaintiff, Charles Whalen, proved that it is more likely true than not that the Defendant used Charles Whalen's ad hoc performance appraisal as his annual rating of record in order to retaliate against him for filling an EEO complaint and refusing to withdraw the EEO complaint." The jury answered "no" to all three.

■ Whalen never submitted jury instructions requesting an advisory jury ruling regarding his claims for injunctive relief. When the district court entered judgment on the jury's verdict, it therefore had only Whalen's individual discrimination claims before it. Before this Court, Whalen conceded that he never asked the district court to rule on the injunctive relief claim after the trial, nor did he file a Rule 59 motion for an amendment to the judgment that would have resuscitated the moribund injunctive claims. Whalen's argument to show that the claims are still alive is limited to pointing back to his initial pleadings claiming pattern or practice discrimination and his request for injunctive relief. In our view, this is too little, too late. Never having asked the district court for injunctive relief, Whalen cannot now claim that the district court erred in not granting an injunction or in excluding evidence that would arguably pertain only to such relief.

### III

■ Without a class action or a properly preserved claim for declaratory and injunc-

tive relief against the IRS affirmative action policy, Whalen is left only with his claim of individual discrimination. In a disparate treatment case, such as Whalen's, the "factual inquiry" for the jury is whether the plaintiff was the victim of intentional discrimination. *U.S. Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983); *Gehring v. Case Corp.,* 43 F.3d 340, 343 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2612, 132 L.Ed.2d 855 (1995). See also *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). Our focus on appeal is consequently limited to whether Whalen carried his burden of proving that the adverse employment action(s) were the result of intentional discrimination by the IRS. *Turgeon v. Premark International,* 87 F.3d 218, 220 (7th Cir. 1996).

In *McQuillen v. Wisconsin Education Ass'n Council,* 830 F.2d 659 (7th Cir.1987), *cert. denied,* 485 U.S. 914, 108 S.Ct. 1068, 99 L.Ed.2d 248 (1988), this Court faced a claim similar to Whalen's, brought by a white male who was a disappointed applicant for a position at the Wisconsin Education Association Council's Legal Services (WEAC) section. As in this case, the WEAC had an affirmative action policy, but it asserted that it handled the hiring procedure in a nondiscriminatory manner and chose Melissa Cherney, the successful candidate, solely on the merits. After a full trial, the district court found that sex was not the determining factor in WEAC's decision to hire Cherney and that Cherney got the job because she was the most qualified candidate. Importantly for the case at hand, this Court declined McQuillen's invitation to review the legality of the WEAC's affirmative action plan. This Court commented that McQuillen's burden of persuasion included "the burden of proving that an affirmative action program is illegal—if the employer asserts that its hiring decision was made pursuant to an affirmative action program." *Id.* at 666. This Court continued as follows:

> If, as in the present case, the employer claims that its hiring decision was based on the applicants' relative qualifications, not an affirmative action program, a plaintiff must first establish that the employer was acting pursuant to an affirmative action plan before the plan's validity is placed in issue.

*Id.* Because McQuillen failed to establish a causal connection between the plan and his hiring claim, there was no need for the Court to address the validity of WEAC's plan.

The same analysis also dooms Whalen's case. The district court gave him the opportunity to introduce evidence of the IRS's affirmative action plan to support his claim that the decision makers had a discriminatory motive when they promoted Price rather than Whalen. This type of evidence was relevant to a key issue in a disparate treatment discrimination case: discriminatory intent. Whether or not the IRS systematically discriminated against white males, or individuals of other characteristics is relevant to Whalen's claim to the extent that it sheds light on the agency's intention to discriminate against Whalen himself. The mere existence of an affirmative action policy is, however, insufficient to prove that the IRS actually intentionally discriminated against Whalen. *Cerrato v. San Francisco Comm. College Dist.,* 26 F.3d 968, 976 (9th Cir.1994); *McQuillen,* 830 F.2d at 666; *Christensen v. Equitable Life,* 767 F.2d 340, 343 (7th Cir. 1985), *cert. denied,* 474 U.S. 1102, 106 S.Ct. 885, 88 L.Ed.2d 920 (1986); *Canham v. Oberlin College,* 666 F.2d 1057, 1061 (6th Cir. 1981). Whalen must establish a link between the IRS' policies and its actions toward him. *Cerrato,* 26 F.3d at 976; *McQuillen,* 830 F.2d at 666; *Canham,* 666 F.2d at 1061.

If this were not true, absurd results could occur. Suppose, for example, Company Z has a policy that sternly frowns on the hiring and promotion of white men. Ms. Jones, the CEO, nonetheless spots a very talented young man, Mr. Smith, adopts him as her protege, and sponsors his meteoric rise through the company ranks. Can Smith sue to challenge the company's otherwise iron-clad discriminatory policy? Obviously not, because he has been unaffected by it. But people who succeed are not the only ones who are unaffected by policies. Another white male, Mr. Doe, at Company Z might

prove to be illiterate, and the company might refuse to promote him or fire him for his inability to do the work. Doe is just as unaffected by Company Z's affirmative policy as Smith was. In the end, whether a policy affects an individual's employment status is a question of fact. The district court's evidentiary rulings here allowed the jury to decide between Whalen's version of the motivations of the hiring committees (*i.e.* the desire to benefit personally from the affirmative action plan or the desire to implement it) and the IRS's version (*i.e.* the desire to select the most qualified individual).

Whalen also attempts to cast his argument in the language of standing, claiming that he as an individual has standing to challenge the IRS's alleged pattern or practice of discriminating against white males. He relies on the Supreme Court's decision in *Northeastern Florida Contractors v. Jacksonville*, 508 U.S. 656, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993), for the proposition that he need not show that he would have gotten the job in order to be able to challenge the policy. For a number of reasons, however, we are unpersuaded by this argument. First, the association in *Northeastern Florida Contractors* had sued the city for declaratory and injunctive relief against its minority business set-aside program. As we noted above, Whalen has not properly preserved his own claims for this type of relief. Thus, it makes no difference whether he would have had standing to challenge the program if he had followed through on these allegations, because he didn't. Second, unlike the IRS here, which disclaimed all reliance on the program, the City was prepared to defend its set-aside ordinance on the merits. Given the injury-in-fact the Court found existed in the inability to compete on an equal footing in the bidding process, the case on remand was ready to move forward on the merits of the constitutional claims presented. In short, no amount of standing alchemy at this stage can transform Whalen's complaint into a pattern or practice claim for injunctive relief against the IRS.

Whalen's other challenges to the district court's evidentiary rulings all assert, in one way or the other, that the district court abused its discretion. As we have noted many times, the district courts have broad discretion in making rulings under Fed. R.Evid. 402 and 403, which we are reluctant to second-guess. *Gagan v. American Cablevision Inc.*, 77 F.3d 951, 967 (7th Cir. 1996); *Grassi v. Information Resources, Inc.*, 63 F.3d 596, 602–03 (7th Cir.1995). We see no abuse of discretion in Judge Castillo's decision to exclude evidence regarding the IRS's alleged failure to discipline a female employee in the Chicago office and evidence relating to the promotions of several female and non-white employees to positions for which Whalen did not apply. Whalen presents for the first time on appeal an argument that the IRS's affirmative action policies violate the Equal Protection Clause of the Fifth Amendment. It is far too late in the case to introduce such an argument, and we therefore do not consider it.

The judgment of the district court is AFFIRMED in all respects.