# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 04-3238 & 04-3369

BERNARD MLYNCZAK, THOMAS J.
BALAMUT, JURGIS PALIULIONIS,
and JOHN D. KASPROWICZ,

*Plaintiffs-Appellants*,

*v.*

SAMUEL W. BODMAN, Secretary,
U. S. Department of Energy,

*Defendant-Appellee.*

_____

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 97 C 4174 & 97 C 4313—**George M. Marovich**, *Judge.*

_____

ARGUED SEPTEMBER 13, 2005—DECIDED APRIL 4, 2006

_____

Before POSNER, RIPPLE, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Argonne National Laboratory, as its website proclaims, "is one of the U.S. Department of Energy's largest research centers." See http://www.anl.gov/about.html. Descended from the World War II Manhattan Project, it now engages in "upwards of 200 research projects, ranging from studies of the atomic nucleus to global climate change research." *Id.* Although

Argonne is operated by the University of Chicago for the Department of Energy's Office of Science, the Department's Chicago Operations Office maintains general oversight over the facility. This case concerns four Department of Energy (DOE) employees who worked at that office, three of whom were in the Argonne Group, and one of whom was a physical scientist and program manager. All four contend that DOE discriminated against them on the basis of their race (white) and gender (male), and retaliated against them when they complained. Three also accused DOE of age discrimination, but they have dropped that theory on appeal. The district court granted summary judgment in favor of DOE. Because the court correctly ruled that the plaintiffs did not raise genuine issues of fact for either their discrimination claims, for which Title VII, 42 U.S.C. § 2000e, provided the exclusive remedy, or the "adverse action" part of their retaliation claims, we affirm.

# I

All four plaintiffs were essentially middle managers at DOE's Chicago Operations Office, employed at the GS-13 level. Plaintiff Bernard Mlynczak was a physical scientist responsible for overseeing the construction of the Advanced Photon Source facility at Argonne. Plaintiff Thomas Balamut worked as a general engineer, managing engineering construction at the Argonne facility. Plaintiff Jurgis Paliulionis was also a general engineer; he was charged with assuring that Argonne followed pertinent DOE policies and regulations in the course of its projects. Finally, plaintiff John Kasprowicz was a program manager and physical scientist; his job involved overseeing technical tests, writing scope-of-work descriptions, and closing out contracts.

A. Alleged Discriminatory Actions

The focal point of each plaintiff's discrimination complaint was DOE's decision to fill three GS-14 positions within the Argonne Group with women—specifically, Eva Pavia (Hispanic), Roxanne Purucker (white), and Susan Heston (white). Anibal Taboas, a male Hispanic, headed the Argonne Group from 1987 to 1995, and it was he who allegedly selected the three women as a result of intentional discrimination against white males. We turn, therefore, to the circumstances of these three decisions, taking the facts in the light most favorable to the plaintiffs.

1. Affirmative Action Policies

Underlying the plaintiffs' complaints about all three specific hiring decisions is a general argument about DOE's affirmative action policy. Briefly put, they claim that this policy permits unlawful reverse discrimination. As plaintiffs' brief puts it, the DOE Affirmative Action and Diversity Plans and Accomplishment Reports reflected a "sub-culture" of reverse discrimination that was statistically driven. The summary judgment record reflects that in the late 1980s, in compliance with a directive from the Equal Employment Opportunity Commission that required all federal agencies to adopt an affirmative action plan, the Chicago DOE office prepared such a plan. The plan set forth the office's goals for providing employment opportunities for women and minorities. About ten years later, the office created a more comprehensive document entitled "Workforce 21," which had goals similar to those in the affirmative action policy.

The focus of the affirmative action plans was on ensuring diversity in the applicant pool for positions at the agency. Thus, while they stress active recruitment of women and minority candidates, they do not contain quotas, nor do they authorize management to give preference to less-qualified female or minority applicants for jobs or promotions.

Instead, the Chicago DOE office is bound by the rules in the DOE Merit Promotion Policy, under which selecting officials may *not* make a hiring or promotion decision based on race, color, sex, national origin, age, or disability. Race or sex may be considered only in the unlikely event that two candidates are so equally qualified that there is no other meaningful distinction between them. That said, the success of managers at the Chicago office in achieving Equal Employment Office (EEO) goals and objectives was one of twelve factors taken into account in their performance evaluations. "Success" was not limited to hiring or promotion decisions; it included a wide variety of career development measures, including recruiting at minority colleges, developing day-care facilities, or attending a career fair directed toward women.

Taboas's scores on this element for the years 1989 to 1993 ranged from "meeting" those objectives to "far exceeding" them. His evaluations reveal that, during that time period, 26 of the 29 promotions and 22 of 31 new hires were awarded to women or minorities. The record does not reveal, however, any detail about what those positions were, who applied, or the qualifications of the applicants. Plaintiffs point out that Taboas admitted that he takes an individual's race, sex, or minority status into consideration, and if he does not see adequate diversity in a job category, he will "look hard" for diversity in the list of qualified applicants. It is against the background of this policy that the three contested employment decisions took place.

### 2. Pavia Hiring

In 1994, a GS-14 Environmental Scientist/Engineer position opened up within the Argonne Group. In preparation for filling the position, supervisor Richard Baker prepared a position description and forwarded it to Elizabeth Lyon, a personnel specialist in the office's human resources department. The HR department had a choice of

filling the position through a noncompetitive process, under which it would look only to current federal employees, or a competitive process, under which it would open the job to all United States citizens. Taboas decided to use the latter process, because he wanted to bring in someone from the outside. Lyon opted for a variant of the competitive process in which DOE could obtain authority from the federal Office of Personnel Management (OPM) to perform the recruitment itself. Although the noncompetitive process was generally used in Chicago, it was not unusual to use the competitive process.

Normally, once the Chicago office receives OPM's authorization, it advertises the vacancy externally and posts it on an internal DOE bulletin board. Vacancy announcements ordinarily remain open for 21 days. In fact, the particular Environmental Scientist/Engineer position at issue had come open some months earlier and had been offered to a white male in another DOE office, but he had declined the offer. As a result, DOE had to begin all over again. Once Lyon began working on it, she accelerated the process, leaving the announcement open for only nine days. She did so because OPM had delayed in giving DOE authority to fill the job, and she was anxious to find someone because she had heard rumors that there would be a hiring freeze.

The plaintiffs testified that Lyon cut corners and failed to post the position internally; Lyon could not say whether she had done so or not, and so we assume that she did not. In any case, the plaintiffs had access to the external advertisement for the position, but they never saw it, and so none of them applied.

Six people did submit applications for this position: Pavia and five others. (Rick Slagle, Lyon's supervisor, stated that he believed that there would have been eight to 10 applications if the position had been posted internally as well.) Lyon scored the applicants and prepared a selection

certificate for further review. Although Baker normally would have been responsible for that review, he was on vacation, and so the certificate went directly to Taboas, Baker's boss. Taboas selected Pavia, whom he had met earlier during a business meeting, for the job. Her qualifications included a law degree, a bachelor of science degree in health physics, and almost nine years of work experience with nuclear and hazardous waste management. Taboas testified that the latter experience was his primary reason for selecting her, given the fact that the environmental scientist position involved project management responsibilities with a significant emphasis on hazardous waste disposal. He also testified that Pavia was the most qualified applicant, in his estimation, and that her qualifications far exceeded those required for the position.

### 3. Purucker Promotion

The second allegedly discriminatory action involved a promotion to a GS-14 position for a safety programs branch manager within the Argonne Group. That position became available in July 1994. Mlynczak applied for it and made it to the short list of candidates, but in the end Taboas selected Roxanne Purucker, without holding interviews. He concluded that Purucker had superior qualifications for the job, because she had the necessary background in industrial safety and hygiene (indeed, she was a certified industrial hygienist), hazardous waste management, and management of a sophisticated contractor staff. Mlynczak believes that his qualifications were equal to or better than Purucker's and that she was promoted solely because she is a woman. He held a bachelor of arts degree in biology and an MBA, and had received a number of excellence awards for his work.

### 4. Heston Appointment

Finally, in October 1994 a position at the Advanced Photon Source (APS) facility at the GS-14 level became available. Robert Wunderlich, a white male who reported to Taboas, appointed Susan Heston to that position, with Taboas's approval. This amounted to a lateral transfer for Heston, who was already working at the GS-14 level elsewhere in the office. Wunderlich did not advertise the position, both because he too was concerned about the anticipated hiring freeze and because he wanted to maintain control over the selection. He had worked with Heston before, and had a favorable impression of her, and he also counted as a plus the fact that she was already at the GS-14 level and could easily make the lateral move. Mlynczak was interested in this position, but he was forestalled from applying for it because it was never posted. He asserts (without citation to the record) in his brief that Heston was being bumped out of a job that she was unable to perform. Once again, he claims that his qualifications far exceeded Heston's, as he had been performing the duties called for in the job and Heston had no experience in accelerator facilities such as the APS. He also asserts, again without a proper reference to the record, that when he asked why he was not selected for this promotion, he was told that "the Secretary of DOE was not awarding any supervisory positions to white males. . . ." After Heston was selected, Wunderlich commented to Mlynczak that he had been "screwed."

### B. Alleged Retaliation

In July 1995, Mlynczak filed complaints with the EEO against Taboas and Wunderlich, claiming that they had discriminated against him in the Pavia, Purucker, and Heston selections. Balamut, Kasprowicz, and Paliulionis also filed EEO complaints with respect to Pavia's hiring.

After these complaints were lodged, all four plaintiffs claimed that individuals in the Chicago office retaliated against them in various ways. For example, in August 1995, Balamut sent a letter to Richard Gallegos, the Director of the Office of Civil Rights and Equal Employment Opportunity at DOE's Western Area Power Administration, expressing his fear that Taboas would engage in violent reprisals because of the EEO complaints. During the same month, Balamut participated in a conference call with a former director of security for DOE, Edward McCallum, who told Balamut that Taboas had committed various security breaches during McCallum's tenure, including improper use of a firearm.

Gallegos forwarded a copy of Balamut's letter to Cherri Langenfeld, the manager of the Chicago office; Langenfeld in turn first met with the director of security, and later provided Taboas with a copy of the letter that identified Balamut as the author. A couple of days later, Balamut sent Langenfeld a letter asking that she keep the Gallegos correspondence confidential and not disclose it to Taboas, but this was obviously too late.

In the end, not much came of this letter aside from a petition that was circulated urging the employees to support Taboas and various acts by which co-workers ostracized Balamut and called him unflattering names (such as "cockroach"). He also claims that his performance ratings have deteriorated, cooperation at the workplace has diminished, and he lost bonus opportunities until he was transferred to a different position. Later, in 1996, Taboas sued Balamut for defamation and other state-law claims. A DOE official told Kasprowicz that Taboas would drop the suit if all EEO matters were also dropped.

## II

On the basis of this record, the district court granted summary judgment for DOE. Because our review of that

decision is *de novo*, we proceed immediately to the arguments plaintiffs have made on appeal. Rather than structuring the discussion plaintiff-by-plaintiff, we look instead at the four alleged grounds for relief: discrimination with respect to the three different promotion decisions and retaliation.

All four plaintiffs have based their claims on Title VII, § 717, of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, which prohibits discrimination based on race, color, religion, sex, and national origin in federal employment. See 42 U.S.C. § 2000e-16. Although Mlynczak asserts that he is also entitled to assert a claim directly under constitutional equal protection principles based on the due process clause of the Fifth Amendment, see *Bolling v. Sharpe,* 347 U.S. 497 (1954), the district court held that this avenue was foreclosed by the Supreme Court's decision in *Brown v. General Services Administration,* 425 U.S. 820 (1976). The district court was correct: *Brown* squarely holds that § 717 "provides the exclusive judicial remedy for claims of discrimination in federal employment." 425 U.S. at 835. Nothing in the Supreme Court's later opinion in *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200 (1995), which does not even cite *Brown* and which concerned the equal protection rights of private federal contractors, changed that rule.

Although claims brought by federal employees are subject to slightly different procedural prerequisites, which apparently were satisfied in these cases (or, as non-jurisdictional points, the government has now forfeited), the substance of the federal employee's right in § 717 is the same as the more familiar rights assured to all other employees, found in § 42 U.S.C. § 2000e-2(a)(1). The rights there assured apply to men as well as women, see *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75 (1998), and to whites as well as members of various minority groups, see *McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 278-79 (1976).

As we noted in *Gore v. Indiana University,* 416 F.3d 590 (7th Cir. 2005), however, conventional analysis

> is not very helpful for so-called reverse-discrimination claims. Because it is the unusual employer who discriminates against majority employees, a male plaintiff alleging gender discrimination must show something more than the fact that he is gendered. . . . Rather, the plaintiff in such cases must show background circumstances that demonstrate that a particular employer has reason or inclination to discriminate invidiously against whites [or men] or evidence that there is something "fishy" about the facts at hand.

*Id.* at 592 (internal quotations and citations omitted).

The plaintiffs recognize this burden, at least implicitly, and attempt to meet it through their reliance on the DOE affirmative action policy and the incentives the agency gives to managers to enhance the diversity of the workforce. Otherwise, our analysis follows the well-established path for any discrimination claim. Here, however, rather than belabor the question whether the plaintiffs are proceeding under the so-called "direct" method of proving discrimination, which includes the possibility of showing discrimination by circumstantial evidence, see *Rudin v. Lincoln Land Cmty. Coll.,* 420 F.3d 712, 720 (7th Cir. 2005); *Troupe v. May Dep't. Stores Co.,* 20 F.3d 734 (7th Cir. 1994), or the "indirect" method launched by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), we have examined the record from both perspectives simultaneously.

We are unpersuaded that any of the so-called direct (meaning circumstantial) evidence of discriminatory intent was enough to save the plaintiffs' cases. Langenfeld, for example, made a number of comments indicating that she was happy that women were being hired, that she would favor a minority candidate over a nonminority candidate, and that it was good for white men to experience a little

discrimination. These comments may reflect small-mindedness on her part, but they fall short of showing that the Chicago office discriminated against these plaintiffs. Langenfeld was not one of the decisionmakers for any of the employment decisions at issue here. See, *e.g.*, *Crabtree v. Nat'l Steel Corp.*, 261 F.3d 715, 723 (7th Cir. 2001) ("Stray remarks made by nondecisionmakers are not evidence that the decision had a discriminatory motive."). Although Taboas was a decisionmaker and the evidence showed that he was philosophically favorable to the hiring of minorities, that does not prove that any particular decision he made was for discriminatory reasons. Wunderlich's comment to Mlynczak that he had been "screwed" over the Heston decision is similarly insufficient. Wunderlich did not refer to Mlynczak's race or gender in making this statement, so the comment could just as easily have been an expression of sympathy, or a reflection that it was tough to lose out to an equally qualified competitor. Mlynczak's belief that Wunderlich was implicitly complaining about the affirmative action policy when he uttered the remark is too conjectural to serve as evidence of race or gender discrimination. As we have noted before, "if the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed." *Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 841-42 (7th Cir. 1996) (quoting *Visser v. Packer Eng'g Assocs.*, 924 F.2d 655, 659 (7th Cir. 1996)). Our evaluation will therefore focus first on the question whether the plaintiffs put before the district court evidence that, if believed, would permit a trier of fact to conclude that any one of them (or more) failed to obtain a position because of unlawful racial discrimination. We then address the retaliation claims.

A.  Pavia

None of the four plaintiffs applied for the position that was eventually awarded to Pavia, because Taboas and Lyon chose to use the "competitive process" and failed to post the opening on the Chicago office's internal bulletin board. The plaintiffs' real complaint is therefore about the loss of an opportunity to apply for the job, rather than the failure of any one of them to succeed in winning it. The plaintiffs argue that the evidence, viewed favorably to them, shows that the real reason why Taboas and Lyon used the "competitive process" was as a means of discriminating against white men. It is almost impossible to follow the citations in their brief that allegedly support this allegation, however, as those citations for the most part seem to refer to paragraphs in various pleadings. In order to avoid summary judgment, of course, they were required to point to evidentiary material—documents, depositions, affidavits, and the like—that could support their position.

The existence of DOE's affirmative action policy alone is not enough to permit a trier of fact to attribute this type of illegal manipulation to the decisionmakers. First, the simple fact that such a policy exists does not prove that intentional discrimination is the reason why a particular individual was not hired or promoted. See *Whalen v. Rubin,* 91 F.3d 1041, 1045 (7th Cir. 1996). The aggrieved person must establish a link between the policy and the employment decision about which he or she is complaining. See *id.* Second, the DOE policies here were of the type that expand the pool of persons under consideration, which is permitted, see *Duffy v. Wolle,* 123 F.3d 1026, 1038-39 (8th Cir. 1997), as long as it is not followed by an explicit policy of preferring the minority candidates in the group, see *Rudin,* 420 F.3d at 721-22. The DOE policies, as we noted earlier, were explicit in the opposite direction: once the pool was created, managers were enjoined not to base their hiring or promotion decisions on a forbidden characteristic. To the extent

that managers like Taboas were rewarded for improving workplace diversity, plaintiffs have introduced nothing refuting the government's evidence that a wide variety of measures were covered, including such innocuous steps as establishing day-care facilities (which presumably help all working parents, not just mothers).

We see nothing inherently discriminatory about a decision to use an open, nationwide, competitive application process as opposed to one restricted to internal candidates. The facts that the application period was shorter than usual and that Taboas made the decision rather than the vacationing Baker do not support a finding of discrimination against these plaintiffs, or white men in general, as these factors equally affected minority and women internal candidates. Plaintiffs do not discuss how Pavia compared with the other five applicants whose resumes were before Lyon and Taboas, with respect to either their relative qualifications for the position or race and gender, therefore it is impossible for us to conclude that Taboas favored her because he had already met her once (a nondiscriminatory reason in any event) or because she was female and Hispanic. In these circumstances, we consider the qualifications the various plaintiffs had for this position (and how they compared to Pavia's) to be beside the point. Discrimination against incumbent employees is not one of the grounds covered by § 717, and we see no other way that a rational trier of fact could find that discrimination explained the decision to use the open competitive process, even though one result of that decision was the failure of any of these plaintiffs to secure the open position.


### B.  Purucker

Mlynczak's argument in support of his claim relating to Purucker's promotion is so abbreviated that we are tempted

to say it is waived. The sum total of the discussion in the opening brief of appellants is as follows:

> Mlynczak's other discrimination claim relates to the promotion of Roxanne Purucker a white female to the GS-14 position of Safety programs Branch Manger [*sic*] in the mid-1990's. Mlynczak asserts, and DOE denies, that his qualifications were at least equal to if not better than Purucker's and that she was promoted only because she is a woman. DOE disputes Mlynczak's qualifications and denies that Purucker was promoted on any basis but merit. [Appellants' Brief at 20.]
>
> * * *
>
> The facts pertaining to the additional Mlynczak discrimination claims are different than those asserted for Pavia but the law and citations to authority are the same. Mlynczak argues the facts without repeating the citations to authority. [Appellants' Brief at 34.]

The second passage cited is followed by general assertions that Taboas and Langenfeld went out of their way to discriminate against white males, and that Mlynczak was well qualified for all of the positions in question.

If, generously construed, this is an argument that a trier of fact could find that Purucker was not as qualified for that position as Mlynczak, and thus that discrimination was the explanation for the choice, we finding it wanting. In *Millbrook v. IBP, Inc.,* 280 F.3d 1169 (7th Cir. 2002), this court addressed "comparative qualifications" arguments in detail. *Id.* at 1177-83. We held there that

> where an employer's proffered non-discriminatory reason for its employment decision is that it selected the most qualified candidate, evidence of the applicants' competing qualifications does not constitute evidence of pretext unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable

persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue.

*Id.* at 1180 (internal quotations omitted). Only this rule, we concluded, would ensure that the role of the court did not degenerate into the inappropriate one of "super personnel department." *Id.* at 1181.

We see nothing in *Ash v. Tyson Foods, Inc.,* 126 S.Ct. 1195 (2006), that requires reconsideration of *Millbrook*'s approach to qualifications evidence. In that decision, the Court reiterated that "qualifications evidence may suffice, at least in some circumstances, to show pretext." *Id.* at 1197. The Court of Appeals for the Eleventh Circuit had colorfully described those circumstances as existing "only when the disparity in qualifications is so apparent as virtually to jump off the page and slap you in the face." *Id.* (internal quotations omitted). The Court disapproved that particular formulation, calling it "unhelpful and imprecise as an elaboration of the standard for inferring pretext from superior qualifications." *Id.* Although the Court expressly refused to provide an authoritative standard, *id.* at 1198, it did set forth with apparent approval other articulations of the standard, which require the plaintiff to show that her qualifications are "clearly superior," or that she is "significantly better qualified" for the job, or that "no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Id.* at 1197-98. Our *Millbrook* standard is essentially the same as the last of these, and thus, as we read *Ash,* is consistent with the law.

Even in light of *Ash,* therefore, we conclude that Mlynczak's evidence of comparative qualifications was insufficient. Finally, for the reasons we have already given, adding the affirmative action policy that DOE had in place to the picture is not enough to create an issue of fact where none existed before.

C.  Heston

Mlynczak's discussion of the Heston position is almost as skimpy. We have already explained why Wunderlich's comment, after Heston was selected, that Mlynczak had been "screwed" is not enough to put him over the summary judgment hurdle. The fact that the deputy project manager, Robert Thompson, thought that Mlynczak was better qualified than Heston, while better evidence than anything Mlynczak had for the Purucker appointment, still falls short under *Millbrook*, particularly because Thompson was not the decisionmaker. DOE offered nondiscriminatory reasons for its decision to transfer Heston laterally within the agency, from one GS-14 position to another, and to move quickly in light of an impending hiring freeze. Mlynczak speculated that the true reason behind Heston's move was her inadequate performance in her old job, but he offers no competent evidence to show that. He points to some evidence showing that, once in the new job, Heston was "mediocre" and spent most of her time "studying and traveling in pursuit of a DOE sponsored degree." This after-the-fact account (assuming for the sake of argument that Mlynczak's evidence competently showed that she was performing badly) does not show, however, that DOE did not genuinely believe its reasons for moving her when it did.

D.  Retaliation

With respect to this part of the case, we have little to add to the district court's analysis. That court correctly acknowledged that Title VII prohibits, among other things, an employer from discriminating "against any of [its] employees . . . because [they have] made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). In order to go forward with their case, the

plaintiff has two options: first, more directly, he may show that (1) he engaged in protected activity and (2) suffered the adverse action in question; or second, he may show that (1) he engaged in the protected activity, (2) afterwards only he, and not any similarly situated employee who did not file a charge [or otherwise engage in protected activity] was subjected to an adverse action, even though (3) he was performing the job satisfactorily. *Stone v. City of Indianapolis Public Utils. Div.,* 281 F.3d 640, 644 (7th Cir. 2002). It is uncontested that the plaintiffs all engaged in protected activities. We therefore focus on whether they suffered any actionable adverse action.

Retaliation plaintiffs normally complain about adverse actions related to their employment—in shorthand, adverse employment actions—and this case is no exception. Not every workplace slight is actionable, however. We have often noted that "mere unhappiness and inconvenience are not actionable under Title VII." See *Haywood v. Lucent Techs., Inc.,* 323 F.3d 524, 532 (7th Cir. 2003) (quoting *Smart v. Ball State Univ.,* 89 F.3d 437, 441 (7th Cir. 1996)). However embarrassing it may have been to Balamut for the letter he wrote to Gallegos to fall into Taboas's hands, and however apprehensive the plaintiffs may have been about an intemperate reaction from Taboas, the fact is that nothing ever happened apart from his filing the defamation lawsuit a year later. The lawsuit—at least in the absence of a showing not made here that it was independently an abuse of process—was not the kind of adverse action that the retaliation statute reaches. Similarly, Kasprowicz's recollection of an incident two years after Taboas saw the letter in which Taboas stared at both him and Mlynczak does not qualify as an adverse action related to employment. The fact that co-workers may have shunned them is also insufficient. See *Griffin v. Potter*, 356 F.3d 824, 830 (7th Cir. 2004) ("General hostility and comments do not qualify as actionable adverse employment actions unless

the hostility was severe and pervasive."). Finally, with respect to Balamut's claim that his performance ratings declined after Taboas received the letter, in *Haywood* we rejected the idea that negative performance appraisals alone could qualify as an adverse employment action. 323 F.3d at 532.

## III

In closing, we emphasize the fact that our review of these events, like the district court's, is necessarily limited to the record that the parties put before us. Our *de novo* review of that record satisfies us that the district court correctly granted summary judgment in favor of the defendant Department of Energy. We therefore AFFIRM the judgment of that court.

A true Copy:

      Teste:

                     _____
                     *Clerk of the United States Court of Appeals for the Seventh Circuit*